154 P.3d 930 (2007)
STATE of Washington, Respondent,
v.
B.J.S.,[1] Appellant.
No. 34529-3-II.
Court of Appeals of Washington, Division 2.
March 20, 2007.
*931 Valerie Marushige, Des Moines, WA, for Appellant.
Susan Irene Baur, Cowlitz Co. Prosecutor's Office, Kelso, WA, for Respondent.
HOUGHTON, C.J.
¶ 1 B.J.S. appeals his adjudications of residential burglary and second degree theft, both under an accomplice liability theory. He argues that insufficient evidence supported his adjudications and that he received ineffective assistance of counsel. We affirm.

*932 FACTS
¶ 2 On November 17, 2005,[2] Jason Norris and a friend discussed the idea of "[t]aking stuff" from Robert Brekke's house while Brekke was away at the beach. Report of Proceedings (RP) at 65. Norris stayed with Brekke for a couple of days before Brekke left for the beach, but Brekke had never given Norris his house's security code.
¶ 3 B.J.S., who was 16 at the time, had spent "a lot" of time at Brekke's house and occasionally spent the night there. RP at 114. Brekke had given B.J.S. his house's security code and let him know where the house key was.
¶ 4 Norris picked up B.J.S. before going to Brekke's house. He discussed his idea with B.J.S. so that B.J.S. would allow him to "do it" and not "say anything" or "give [him] up." RP at 72. He brought B.J.S. along to enter the security code correctly and to deal with any visitors he did not know who might arrive at the house.
¶ 5 Sometime after midnight, Norris and B.J.S. arrived at Brekke's house. Norris took electronic devices, credit cards, and cash from the house. B.J.S. did not assist Norris, but saw him taking things. Sometime after 6 A.M. that morning, Norris and B.J.S. left the house with the items Norris had taken. Norris dropped off B.J.S., took the items "somewhere," and "unloaded" them in exchange for a later payment. RP at 94, 95. Later, Norris gave B.J.S. some of the cash, but did not tell him where it came from.
¶ 6 After dropping off the items, Norris picked up someone named James, bought some "dope," and then picked up B.J.S. The three then went to Brekke's house. While at the house, Norris took some more credit cards and some pills. Norris did not see either James or B.J.S. take anything from the house. Norris and James attempted to use some lock cutters on an outbuilding on the property, but they did not work. B.J.S. did not use the lock cutters.
¶ 7 Timothy Entler and Dustin Albright went to Brekke's house on the morning of November 18 to see if Brekke had returned from the beach. Brekke was not home when they got there, and they noticed that two of his vehicles were missing. Entler and Albright left Brekke's house, and Albright called the police from his house. Entler and Albright returned to Brekke's house and noticed one of his vehicles was back on the property. Entler saw some people running from the house, but he could not identify who they were.
¶ 8 The State charged B.J.S. with two counts of residential burglary, two counts of second degree theft, and one count of second degree taking a motor vehicle without permission. B.J.S. had an adjudicatory hearing for the charges on February 14, 2006. Among others, Norris, B.J.S., Entler, and Albright testified.
¶ 9 Norris testified he and B.J.S. went to Brekke's the first time to "party" and returned the second time to get his car. He said the idea to burglarize Brekke's house was a spur of the moment decision and he had Brekke's security code. He also testified he thought of burglarizing Brekke's house on November 17 and talked B.J.S. into "allowing [him] to do it and not to say anything or not to give [him] up or nothing. You know, making it okay." RP at 72. He said he needed B.J.S. to come with him "[t]o make sure that [he] had the [security] code right" and because he wanted B.J.S. there in case someone he did not know arrived to the residence. RP at 72.
¶ 10 Norris also read portions of a written statement he prepared on November 18 after the incident. In his statement, he said he had to talk to B.J.S. before "going through with anything" at Brekke's house and discussed a conversation he had with B.J.S., stating,
I brought it up to [B.J.S.] who acted completely out of character by not just saying yes, but like he might enjoy it too.
. . . .
That was truly out of character for [B.J.S.] so I asked him a few times on the way over to [James's] house if he was sure about wanting to do this.

*933 . . . .
And he constantly repeated his answer was yes.
RP at 101. When asked what "[w]anted to do this" referred to, Norris said, "I think we were on our way to go get dope" and that it did not have to do with burglarizing Brekke's house. RP at 101. Another portion of his statement read, "I heard glass breaking and [B.J.S.] say you should have used bolt cutters, not punch it." RP at 102. Norris said this statement had to do with James cutting padlocks on outbuildings on Brekke's property, which "[n]othing was taken out of." RP at 103.
¶ 11 B.J.S. testified that he had permission from Brekke to be at his house when he was not there. He said he did not take anything from Brekke's house and did not see Norris take anything. He verified Norris's statements that he was at Brekke's house on the early morning of November 18, left the house sometime around 6 A.M., and then returned later that day.
¶ 12 After the State rested, the juvenile court judge dismissed the second degree taking a motor vehicle without permission count. The juvenile court judge found that Norris's claim that he had Brekke's security code was not credible and found that Norris was attempting to "take the fall" for B.J.S. because his testimony was inconsistent and not credible. RP at 125. The juvenile court judge concluded that B.J.S. had aided and abetted Norris and found him guilty of one count of residential burglary and one count of second degree theft.
¶ 13 After the juvenile court judge's ruling, B.J.S. moved for a deferred disposition. The juvenile court judge found he was not eligible because he did not move for deferred disposition before the adjudication hearing. B.J.S.'s counsel told the court she had advised B.J.S., "if he went to trial that he could seek a deferred." RP at 131. B.J.S. received an adjudication of 10 days' confinement and 6 months of community supervision for each count. B.J.S. appeals.

ANALYSIS

SUFFICIENCY OF THE EVIDENCE
¶ 14 B.J.S. first contends that there is insufficient evidence to support his adjudications of residential burglary and second degree theft under an accomplice liability theory.
¶ 15 On a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could find the elements of the offense beyond a reasonable doubt. State v. Gentry, 125 Wash.2d 570, 596-97, 888 P.2d 1105 (1995). In reviewing a juvenile court adjudication, we must decide whether substantial evidence supports the trial court's findings of fact and, in turn, whether the findings support the conclusions of law. State v. Alvarez, 105 Wash.App. 215, 220, 19 P.3d 485 (2001). We treat unchallenged findings of fact as verities on appeal. State v. Levy, 156 Wash.2d 709, 733, 132 P.3d 1076 (2006). We review conclusions of law de novo. Levy, 156 Wash.2d at 733, 132 P.3d 1076. A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences drawn therefrom. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970 (2004). Circumstantial evidence is equally reliable as direct evidence. State v. Varga, 151 Wash.2d 179, 201, 86 P.3d 139 (2004).
¶ 16 To adjudicate B.J.S. of residential burglary, the State had to show that he remained "unlawfully in a dwelling other than a vehicle" with the intent "to commit a crime against a person or property therein." RCW 9A.52.025(1). To adjudicate him of second degree theft as the juvenile court did, the State had to show he committed theft of an access device (such as a credit card).[3] RCW 9A.56.040(c), .010(1). Because the juvenile *934 court judge adjudicated him as an accomplice for both crimes, the State had to show that he encouraged or aided Norris in the planning or commission of the crimes with the knowledge that his actions would promote or facilitate the crimes. RCW 9A.08.020(3)(a)(ii). "Aiding" in a crime includes "`all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his . . . presence is aiding in the commission of the crime.'" State v. Dove, 52 Wash.App. 81, 87, 757 P.2d 990 (1988) (quoting 11 WASHINGTON PRACTICE: WASHINGTON. PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51, at 56 (1st ed.1977 and Supp. 1986)).
¶ 17 B.J.S. does not dispute that he was at Brekke's house while Norris burglarized it and stole credit cards. Rather, he argues that insufficient evidence showed that he aided or abetted Norris in committing the crimes, claiming that substantial evidence does not support the juvenile court judge's findings of fact 2-5[4] and, therefore, the juvenile court's findings fail to support its conclusions of law.
¶ 18 Finding of fact 2 deals directly with Norris's credibility, an issue that we do not review on appeal. See Thomas, 150 Wash.2d at 874-75, 83 P.3d 970. Accordingly, we defer to the juvenile court judge's finding. Thomas, 150 Wash.2d at 874-75, 83 P.3d 970.
¶ 19 B.J.S. challenges finding of fact 3 on the basis that the juvenile court found there was "no evidence" that Norris knew Brekke's security code even though Norris testified that he did. Clerk's Papers (CP) at 1. The juvenile court judge specifically discussed this finding in his oral ruling. Although this oral ruling is not a finding of fact, we may look to the juvenile court judge's oral ruling to interpret written findings. State v. Hescock, 98 Wash.App. 600, 605, 606, 989 P.2d 1251 (1999).
¶ 20 In his oral ruling, the juvenile court judge recognized that Norris did testify he had the security code, but the juvenile court judge stated that he did not find this testimony credible. The juvenile court judge's credibility determination was the basis for the wording of this finding of fact, and it is one that we will not disturb on appeal. See Thomas, 150 Wash.2d at 874-75, 83 P.3d 970. Although it may have been more precise if finding of fact 3 said there was no "credible" evidence, there is substantial evidence to support this finding.
¶ 21 B.J.S. also challenges finding of fact 4, which states that B.J.S. "was brought along to enter the security access code and to deal with any visitors that may show up at the home while the burglary was in progress." CP at 1. The juvenile court judge did not find Norris's testimony that B.J.S. went to Brekke's house on November 18 for purposes other than the burglary credible. Instead, he found it more persuasive that Norris told B.J.S. his plan to burglarize the house and brought him along to aid in the burglary. Deferring to the juvenile court judge's credibility ruling, there was substantial evidence to support this finding of fact.
¶ 22 B.J.S. challenges finding of fact 5, which provides he "fled the scene of the crime." CP at 1. Entler testified he saw some people running from the house, but he could not identify either one as B.J.S. The record shows that B.J.S., Norris, and James were at the house on the morning Entler saw people running from the house, and police did not find anyone at the house when they responded. Viewing this evidence in the light most favorable to the State, it is reasonable to infer that B.J.S. was one of the people who fled from the home. Substantial evidence supports this finding.
¶ 23 Considering the evidence in the light most favorable to the State and all reasonable inferences from it, the juvenile court judge had sufficient evidence to find, beyond a reasonable doubt, that B.J.S. was an accomplice to the residential burglary and *935 second degree theft. Norris testified that he burglarized Brekke's house after telling B.J.S. the plan and bringing him along to enter the security code and deal with anyone he did not know who came by. Although Norris testified that B.J.S. went to the house for other purposes, the juvenile court judge found this testimony not credible. It is reasonable to infer that B.J.S. was present at the house to facilitate in the commission of the crime. His sufficiency argument fails.

INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 24 Next, B.J.S. claims he received ineffective assistance of counsel because his counsel failed to advise him of the possibility of deferred disposition prior to the adjudication hearing.
¶ 25 We review a claim of ineffective assistance of counsel de novo, as it is a mixed question of law and fact. . To establish ineffective assistance of counsel, a defendant must show first that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's performance is deficient when it falls below an objective standard of reasonableness. In re Pers. Restraint of Pirtle, 136 Wash.2d 467, 487, 965 P.2d 593 (1998). Prejudice occurs when, but for the deficient performance, there is a reasonable probability that the outcome would have differed. Pirtle, 136 Wash.2d at 487, 965 P.2d 593. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. B.J.S. bears the burden of showing prejudice. State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995).
¶ 26 For a juvenile to be eligible for deferred disposition, the State must not charge him with a sex or violent offense and he must not have a criminal history that includes a felony, a prior deferred disposition or deferred adjudication, or two or more adjudications. RCW 13.40.127(1). The juvenile court may continue the case for disposition if the juvenile, among other things, (1) moves for disposition 14 days prior to trial, (2) stipulates to the admissibility of the facts in the police report, and (3) acknowledges that the court will use the report to support a finding of guilt. RCW 13.40.127(2), (3)(a) and (b). After it has considered whether the offender and the community will benefit from a deferred disposition, the court has discretion to continue the case for disposition for a period of not more than one year from the date it finds the juvenile guilty. RCW 13.40.127(2).
¶ 27 Based on B.J.S.'s criminal history, he was eligible for a deferred disposition, but his counsel did not move for a deferred disposition prior to the adjudication hearing. Defense counsel admitted that she incorrectly advised B.J.S. he could seek a deferred disposition after the adjudication hearing. The State concedes that counsel's failure to advise B.J.S. properly fell below an objective standard of reasonableness, satisfying the first Strickland prong. But the State argues that he does not sufficiently establish the second Strickland prong because he does not establish prejudice from counsel's deficiency.
¶ 28 To show counsel's deficiency prejudiced him, B.J.S. must show that there is a reasonable probability that the juvenile court judge would have deferred his disposition had he moved for it in a timely fashion. Although B.J.S. cites to a statement by the juvenile court judge after his adjudication, it is not apparent that there was a reasonable probability a judge would have granted a deferral of disposition. B.J.S. also provides a bare assertion that he could have moved for deferred disposition had his counsel properly advised him, but this is insufficient to establish the necessary prejudice as defined in Strickland.[5]See State v. Cox, 109 Wash. App. 937, 941-42, 38 P.3d 371 (2002). As B.J.S. does not meet his burden of establishing prejudice, his ineffective assistance of counsel claim fails.
¶ 29 Affirmed.
We concur: QUINN-BRINTNALL and VAN DEREN, JJ.
NOTES
[1] B.J.S. committed the crimes when he was a minor. Although he is now over 18 years old, this opinion uses his initials.
[2] Although there are discrepancies in the record as to the date, this date is the most consistent with testimony and the dates in the Clerk's Papers.
[3] "`Access device' means any card, plate, code, account number, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services, or anything else of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument." RCW 9A.56.010(1).
[4] Finding of fact 2: "The co-defendant Jason Norris was taking the fall for the Respondent." Finding of fact 3: "There was no evidence that Jason Norris knew the security access code to Robert Brekke's home." Finding of fact 4: "The Respondent was brought along to enter the security access code and to deal with any visitors that may show up at the home while the burglary was in progress." Finding of fact 5: "The Respondent fled the scene of the crime which is contrary to having permission to be on the property." Clerk's Papers at 1.
[5] Further, B.J.S. testified at trial that he was innocent, which does not support his assertion he would have stipulated to the police report establishing his guilt.