FILED
COURT OF APPEALS
DIVISION II

2015 JUN 16 AM 8: 30

STATE OF WASHINGTON
BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45461-1-II |
| Respondent, | |
| v. | |
| K H-H, | PUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — KH-H appeals from his guilty adjudication in juvenile court for fourth degree assault with sexual motivation, based on conduct against CR, a teenaged girl, and from the resulting disposition. KH-H contends that (1) insufficient evidence supports the adjudication of guilt and (2) a condition of the disposition requiring him to write an apology letter violates his rights under the Washington and federal constitutions. We affirm.

## FACTS

KH-H and CR attended the same high school and had friends in common. On October 1, 2012, KH-H accompanied CR to her house after school; there were no adults at CR's home at that time. KH-H and CR sat on CR's bed and watched videos on CR's phone.

KH-H began kissing CR on the face and neck, and CR responded by telling KH-H "to chill it or to back off." Report of Proceedings (RP) at 29. KH-H pushed CR onto her back, leaned over her, and began biting her neck. CR tried to push KH-H away and told him to "stop," to get off her, and that it hurt. RP at 35. KH-H "pushed his weight down more on [her] hands," reached under her shirt and bra to grab her breasts, and reached into and "tr[ied] to undo [her]

pants." RP at 32-33. CR then grabbed her cell phone, turned it on, and said she would call her father. KH-H got up and left the house.

CR later noticed three "hickies" or bruises on her neck. Clerk's Papers (CP) at 18. CR showed the marks to a friend, JS, and told JS about the incident. JS confronted KH-H, whom she had considered a friend, and KH-H told JS that he had gone to CR's house after school, that they had had a "sexual connection," and that he gave her "love bites." RP at 66. JS told a school official about the incident.

The State charged KH-H with two counts of fourth degree assault with sexual motivation, based on the incident involving CR and based on an unrelated incident involving a different teenaged girl. At the juvenile court fact-finding hearing, CR and JS testified to the facts as set forth above. For impeachment purposes, the court admitted a stipulation that stated:

> On October 9, 2012, Officer Bryce Clother interviewed C.R. at Lincoln High School. During that interview, Officer Clother asked C.R. if she told [KH-H] to stop, and C.R. said that she had not, but she had tried to push [him] away.

CP at 13-14.

The juvenile court adjudicated KH-H guilty on the count involving CR and not guilty on the other count. Based on various observations about her conduct under examination, the trial court expressly found that CR was a "credible witness," describing key portions of her testimony as "compelling." CP at 20.

At the disposition hearing, the State asked the court to order KH-H to write CR an apology letter, making clear that it expected "a sincere written letter of apology . . . mean[ing] an admission that he did what he was accused of what he's doing [sic] and [is] sorry he put her in that position." RP at 149. Defense counsel objected to this condition, stating:

[KH-H] now understands that the Court has found him guilty, but it doesn't mean that he has to then turn around and say, well, yes, I did something . . . [H]e still has the right to make that decision.

RP at 150-51.

The juvenile court sentenced KH-H to three months of community supervision. The disposition order also required KH-H to "write a letter of apology to [CR] that is approved by the Probation Officer and the State." CP at 42. KH-H appeals.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

KH-H first contends that the State presented insufficient evidence for a reasonable trier of fact to conclude beyond a reasonable doubt that he assaulted CR with sexual motivation. We disagree.

When reviewing a challenge to the sufficiency of the evidence supporting an adjudication of guilt in a juvenile proceeding, "we must decide whether substantial evidence supports the trial court's findings of fact and, in turn, whether the findings support the conclusions of law." *State v. B.J.S.*, 140 Wn. App. 91, 97, 169 P.3d 34 (2007). In doing so, we view the evidence in a light most favorable to the State, and we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *B.J.S.*, 140 Wn. App. at 97; *State v. J.P.*, 130 Wn. App. 887, 891-92, 125 P.3d 215 (2005). Because KH-H has not assigned error to any of the trial court's factual findings, we treat those findings as verities on appeal. *B.J.S.*, 140 Wn. App. at 97.

To convict KH-H for fourth degree assault with sexual motivation, the State had to prove beyond a reasonable doubt that he assaulted CR for the purpose of his sexual gratification. RCW 9A.36.041(1); former RCW 13.40.020(31) (2012); RCW 13.40.135. Because "assault" has not been defined by statute, Washington courts use three common law definitions of assault: "(1) an attempt, with unlawful force, to inflict bodily injury upon another; (2) an unlawful touching with criminal intent; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is incapable of inflicting that harm." *State v. Stevens*, 158 Wn.2d 304, 310-11, 143 P.3d 817 (2006). The State asserts that it presented sufficient evidence in support of the second definition of assault—that KH-H unlawfully touched CR with criminal intent. We agree with the State.

To prove that KH-H acted with criminal intent, the State had to show that he acted "with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(a). And to prove that his touching of CR was unlawful, the State had to establish that the touching was unprivileged, that it was either harmful or offensive, and that CR did not legally consent to being touched. *State v. Jarvis*, 160 Wn. App. 111, 118, 246 P.3d 1280 (2011). Finally, to prove that KH-H committed the assault with sexual motivation, the State had to show that sexual gratification was one of his purposes in assaulting CR. *State v. Halstien*, 65 Wn. App. 845, 851, 829 P.2d 1145 (1992), *aff'd* 122 Wn.2d 109, 857 P.2d 270 (1993).

Here, the following unchallenged findings of fact clearly support the trial court's conclusion that KH-H committed fourth degree assault with sexual motivation based on an unlawful touching of CR with criminal intent:

## V.

While he was sitting on C.R.'s bed, [KH-H] began to make sexual advances towards C.R. [KH-H] started kissing C.R. on her mouth and cheek, then moved to her neck. C.R. was leaning back against the wall, and [KH-H] pushed C.R. the rest of the way onto her back, then climbed onto her so he was "hovering" over her, essentially straddling C.R. with one of his legs on either side of her. [KH-H] was facing down at C.R. while she was facing up towards him on her back.

## VI.

[KH-H] put his mouth on C.R.'s neck and bit her several times hard enough to leave three separate "hickies" or "love bites" on her neck, one on the left side, one in the middle, and one on the right side of her neck. C.R. said the respondent bit her hard enough each time that it hurt. The marks on C.R.'s neck remained visible for over a week, and C.R. used scarves to cover the marks when she was around other people. C.R. did not consent to being kissed or bitten by [KH-H].

## VII.

Under the circumstances as described by C.R., being kissed on the cheek and mouth, and being kissed and bitten on the neck, are harmful and offensive contacts because C.R. did not have any dating or significant-other relationship with [KH-H] and did not consent at any time to have him do those things to her.

## VIII.

While he was trying to kiss and bite C.R., [KH-H] also put his hand inside her shirt and tried to touch her breasts, and he tried to unbutton her pants. C.R. told [KH-H] to stop, physically resisted [KH-H]'s efforts, and tried to push [KH-H] off her.

## IX.

[KH-H]'s efforts to kiss C.R. on her mouth, cheek, and neck, and his efforts to get his hand on her breasts and into her pants, demonstrate his actions were done for the purpose of his sexual gratification.

CP at 36-37.

KH-H does not contend that substantial evidence in the record fails to support these findings, or that these findings fail to support the trial court's conclusion that he was guilty of fourth degree assault with sexual motivation. Instead, KH-H contends that the trial court failed to include certain crucial facts in its written findings, which crucial facts KH-H contends show

that he did not act with criminal intent because CR was sending him "mixed messages."[1] Br. of Appellant at 11. KH-H's contention with the trial court's omission of these "crucial facts" from its findings is not an appropriate means to challenge the sufficiency of evidence supporting his guilty adjudication because it requires us to reevaluate the persuasiveness of the evidence and the credibility of CR's testimony, which is an exclusive function of the fact-finder. *J.P.*, 130 Wn. App. at 891-92. Accordingly, we hold that the State presented sufficient evidence in support of KH-H's juvenile adjudication of guilt to fourth degree assault with sexual motivation.

## II. CONSTITUTIONALITY OF LETTER-OF-APOLOGY CONDITION

Next, KH-H challenges the condition in his disposition order requiring him to write a letter of apology to CR, contending that the condition violates his rights under the First Amendment of the United States Constitution and article I, section 5 of the Washington Constitution. Because the disposition condition requiring KH-H to write a letter of apology to CR serves the State's compelling interest in rehabilitating juvenile offenders, we hold that the condition did not violate KH-H's constitutional rights.

A.   *First Amendment*

The First Amendment of the United States Constitution, by incorporation into the Fourteenth Amendment due process clause, prohibits states from "abridging the freedom of speech." U.S. CONST. amend. I; *Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 69 L. Ed.

---

[1] For example, KH-H argues that the trial court erred by omitting from its findings the facts that (1) CR apparently told the investigating officer that she had not expressly told KH-H to stop but had only pushed him away; (2) when KH-H initially pulled her onto his lap, according to CR's testimony, she "wiggled and . . . moved off" but did not verbally protest; (3) CR admitted that KH-H did not pin or hold her down during the incident; as well as (4) various facts tending to show that CR liked KH-H, felt attracted to him, and had previously had consensual physical contact with him, such has holding hands and hugging. RP at 28.

1138 (1925). The United States Supreme Court has held that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977). The protection from compelled speech extends to statements of fact as well as of opinion. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).

In concluding that the challenged disposition condition here did not violate KH-H's First Amendment rights, we are guided by *United States v. Clark*, 918 F.2d 843 (9th Cir. 1990), *overruled on other grounds by United States v. Keys*, 133 F.3d 1282 (9th Cir. 1998), a Ninth Circuit Court of Appeals opinion that upheld the constitutionality of a similar condition.

In *Clark*, two police officers were convicted of perjury and were ordered to publish an apology admitting to the truth of their charges as a condition of their probation. *Clark*, 918 F.2d at 845. The court stated that the test for determining whether the probation condition violated the officers' First Amendment right to refrain from speaking was "'whether the [condition was] primarily designed to affect the rehabilitation of the probationer or insure the protection of the public.'" *Clark*, 918 F.2d at 848 (quoting *United States v. Consuelo-Gonzales*, 521 F.2d 259, 265, n.14 (9th Cir. 1975)).

In applying this test, the court in *Clark* stated that a reviewing court "'must determine whether the sentencing judge imposed the conditions for permissible purposes, and then it must determine whether the conditions are reasonably related to the purposes.'" 918 F.2d at 848 (quoting *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988)). The court noted that this

test applies "even where preferred rights are affected." *Clark*, 918 F.2d at 847. The court held

that the probation condition requiring the officers to publish an apology met this test, reasoning:

> The record supports the conclusion that the judge imposed the requirement of a public apology for rehabilitation. Neither [of the officers] have admitted guilt or taken responsibility for their actions. Therefore, a public apology may serve a rehabilitative purpose. *See Gollaher v. United States*, 419 F.2d 520, 530 (9th Cir.) ("It is almost axiomatic that the first step toward rehabilitation of an offender is the offender's recognition that he was at fault."), *cert. denied*, 396 U.S. 960, 90 S. Ct. 434, 24 L. Ed. 2d 424 (1969). Because the probation condition was reasonably related to the permissible end of rehabilitation, requiring it was not an abuse of discretion.

918 F.2d at 848.

Similar to the probation statute examined in *Clark*, rehabilitation is one of the primary

purposes of the Juvenile Justice Act (JAA) of 1977. RCW 13.40.010; *see also State v. Rice*, 98

Wn.2d 384, 394, 655 P.2d 1145 (1982) ("[I]n resolving any issue which turns on the legislative

purpose of [the JAA], we must ensure that our decision effectuates to the fullest possible extent

both the purpose of rehabilitation and the purpose of punishment."), *rejection on other grounds*

*recognized by State v. Coria*, 120 Wn.2d 156, 170, 839 P.2d 890 (1992)). Accordingly, in

examining whether a disposition condition imposed under the JAA violates the First Amendment

protection against compelled speech, we apply the test articulated in *Clark*.

Applying that test here, we hold that the "letter of apology" condition did not violate

KH-H's First Amendment rights. As in *Clark*, the record here supports the conclusion that the

juvenile court imposed the challenged condition for the purpose of rehabilitating KH-H. In

discussing the requirement that KH-H write a letter of apology to the victim, the juvenile court

noted its concern that KH-H would again offend based on his pattern of being disrespectful to

women. And requiring KH-H to apologize to the victim of the offense that he was adjudicated

8

guilty of committing is reasonably related to the rehabilitative purpose of the JAA. Accordingly, we hold that the condition did not violate KH-H's rights under the First Amendment.

B.      *Article I, Section 5*

Article I, section 5 of the Washington Constitution provides, "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The parties have not identified, and we have not located, any case addressing whether article I, section 5 applies to protect against compelled speech, let alone whether it provides greater protection than that afforded under the First Amendment. And KH-H does not argue that article I, section 5 provides greater protection than the First Amendment in this context.

Moreover, even if KH-H had argued that article I, section 5 provides greater protections than the First Amendment in this context, his brief fails to provide an analysis of the *Gunwall*[2] factors for making this determination and, thus, we need not address it further. *See State v. Davis*, 141 Wn.2d 798, 834, 10 P.3d 977 (2000) (declining to address argument that state constitutional provision provided greater protection that its federal counterpart where appellant failed to brief *Gunwall* factors). Although previous cases have determined that article I, section 5 provides greater protections than the First Amendment in different contexts, such prior determinations do not relieve KH-H of his obligation to provide briefing of the *Gunwall* factors if he wants to assert that article I, section 5 provides greater protection in the context of State compelled speech. *See Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 115, 937 P.2d 154 (1997) ("Even where a state constitutional provision has been subject to independent interpretation and found to be more protective in a particular context, it does not follow that

---

[2] *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

No. 45461-1-II

greater protection is provided in all contexts."); *see also State v. Reece*, 110 Wn.2d 766, 7778, 757 P.2d 947 (1998) (The proper inquiry under *Gunwall* is whether "on a given subject matter" the Washington constitutional provision should give greater protection than the minimum protection afforded by the federal constitution.).

Because KH-H does not argue that article I, section 5 provides greater protection than the First Amendment, and because the challenged disposition condition does not violate KH-H's First Amendment rights under the test set forth in *Clark*, we affirm.

_____
Worswick, J.

_____
Sutton, J.

No. 45461-1-II

BJORGEN, A.C.J. (dissenting in part) — I agree with the majority's analysis concluding that sufficient evidence supported the adjudication of guilt. I part with the majority, though, on the constitutional issue and would hold that requiring KH-H to write a letter of apology and confession offends the First Amendment of the United States Constitution.

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 639, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943), the Supreme Court held that a compelled flag salute and pledge of allegiance in public schools violated the First Amendment. The Court rested its holding on the recognition that

> [i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

*Barnette*, 319 U.S. at 642. The compelled salute and pledge, the Court held,

> transcends constitutional limitations . . . and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.

*Id.* at 642.

The Court expanded the reach of its rationale in *Barnette* by holding in *Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), that the State may not compel individuals to display on their vehicles a license plate motto with which they disagree. At the core of the Court's rationale was its conclusion that

> the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. *See Board of Education v. Barnette*, 319 U.S. 624, 633-634, 63 S. Ct. 1178, 1182-1183, 87 L. Ed. 1628 (1943); *id.*, at 645, 63 S. Ct., at 1188 (Murphy, J., concurring). A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster

11

such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind." *Id.*, at 637.

*Wooley*, 430 U.S. at 714; *see also Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974).

Although these holdings from *Barnette* and *Wooley* may suggest a per se condemnation of any compelled expression of attitude or opinion, that approach was not followed by either opinion. The *Barnette* Court held that

> freedoms of speech and of press, of assembly, and of worship . . . are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect.

*Barnette*, 319 U.S. at 639. *Wooley* took a somewhat different approach, explaining that

> [i]dentifying the Maynards' interests as implicating First Amendment protections does not end our inquiry however. We must also determine whether the State's countervailing interest is sufficiently compelling to justify requiring appellees to display the state motto on their license plates.

*Wooley*, 430 U.S. at 715-16. The principles on which *Barnette* and *Wooley* draw, read analogously with *Brandenburg*'s[3] enduring rule that certain speech may be prohibited only if it is likely to incite imminent lawless action, suggest at the least that the State may compel speech only if necessary to prevent a grave and imminent danger. Whether the First Amendment erects a per se bar against compelled speech need not be addressed for purposes of this dissent.

Our case law also recognizes the presumptive limitation of constitutional rights of certain classes, such as prisoners. *See, e.g., Pell v. Procunier*, 417 U.S. 817, 822, 826, 94 S. Ct. 2800, 41

---

[3] *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969).

L. Ed. 2d 495 (1974). Similarly, a number of federal circuit court decisions have upheld probation conditions which limit First Amendment rights. Even prisons, though,

> are not beyond the reach of the Constitution. . . . Indeed, we have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration.

*Hudson v. Palmer*, 468 U.S. 517, 523, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984).

Even if this authority allows some reduction in the First Amendment rights of adjudicated juveniles, the luster of the principles followed in *Barnette* and *Wooley* demands that their sacrifice rest on something more than a presumed rational basis. Yet that is all that the State or the majority offer.[4]

In the name of rehabilitation, the condition here at issue would force a citizen to apologize for an action even if he felt no remorse and to admit to a wrongful action even if he sincerely felt he was not in the wrong. If there is a sound and discriminating empirical basis for concluding that this sort of compulsion will nourish responsibility among juveniles, instead of simply schooling them in cynical manipulation, it is not before us in this appeal. Something more than a law review article or the factual assumptions of other courts is needed. Without that empirical and individualized basis, only the presumed best intentions of our system stand in the

---

[4] The majority is correct that under the rational basis test used in *United States v. Clark*, 918 F.2d 843, 848 (9th Cir. 1990), *overruled on other grounds by United States v. Keys*, 133 F.3d 1282 (9th Cir. 1998), the condition here at issue should be upheld. However, *Freeman v. Lane*, 962 F.2d 1252, 1258 (7th Cir. 1992) (quoting *United States ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1075 (7th Cir. 1970)), held that

> "[i]n passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is a parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court."

For the reasons here expressed, the deferential approach of *Clark* contradicts the principles that underlie both *Barnette* and *Wooley*. Therefore, *Clark* is not controlling.

way of disquieting comparisons with other attempts at forced thought. The First Amendment requires more from us.

After *Buckley v. Valeo*,[5] after *Citizens United*,[6] we may justly wonder what remains of the marketplace of ideas theory of the First Amendment; as what was once a marketplace becomes monopolized by those with the means to buy both voice and decibel, as the oaths of public office become spoken more by those who best pleased the few with the means to purchase campaign persuasions. What remains, at the least, is the protection of that "sphere of intellect and spirit" spoken of in *Barnette*[7] and the "individual freedom of mind" cited in *Wooley*.[8] What remains is the less pragmatic, but more sublime purpose of protecting the free and incandescent workings of the human mind.

The restriction of what may be said does not restrict what may be thought. The prescription of what must be said, on the other hand, compels what is professed, and with that more closely touches the instruments of thought, more deeply trespasses on our crowning zone of privacy, on the beauties and mysteries of the mind. To guard these treasures, the compulsion of attitude and opinion here at issue, if not barred per se, should be allowed only if the strict

---

[5] *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

[6] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

[7] 391 U.S. at 642.

[8] 430 U.S. at 714.

No. 45461-1-II

standards of *Barnette* are met. The State's showing does not remotely approach those standards.

Therefore, I dissent.

Bjorgen, A.C.J.

15