NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 22, 2022

S21Z0916.  INQUIRY CONCERNING JUDGE ERIC W. NORRIS.

PER CURIAM.

This judicial discipline matter is before the Court following a report and recommendation from the Hearing Panel ("Panel") of the Judicial Qualifications Commission ("JQC") to resolve formal charges brought by the Director of the JQC against Judge Eric W. Norris of the Superior Court for the Western Judicial Circuit (Clarke and Oconee counties). A majority of the Panel recommended that Judge Norris issue a public apology for violating Rules 1.2 (A) and 2.8 (B) of the Georgia Code of Judicial Conduct, with the dissent recommending censure from this Court along with a public apology. The Director excepts to the recommended sanction, asserting that a public reprimand is appropriate. For the reasons stated below, we disagree that a public apology or a censure is an appropriate

sanction and order that Judge Norris be publicly reprimanded.

1. The relevant facts, as found by the Panel, are not in dispute. On July 5, 2019, the Athens Banner-Herald published an article about a defendant who had an outstanding bench warrant for failing to appear in court for the retrial of his rape charges. Judge Norris had presided over the first trial, which resulted in a mistrial, and released the defendant on his own recognizance. On that same day, Nathan Owens, a bail bondsman who works in Clarke and Oconee counties, reposted the story to his personal Facebook page and to a large Facebook group called "Overheard at UGA"; Owens included his thoughts of Judge Norris's handling of the case and his opinion that the defendant should not have been released on his own recognizance. Owens's post gained a lot of attention, eventually prompting Judge Norris to contact another bondsman, John Elliott, in an effort to get in contact with Owens. On July 9, at the suggestion of Elliott, Owens texted Judge Norris, and Judge Norris told Owens to meet him in his office at 9:00 a.m. the following morning.

On the morning of July 10, Owens went to the courthouse with

Elliott and another bondsman, Scott Hall. When the trio arrived at Judge Norris's chambers, an armed deputy took their cell phones. Judge Norris then arrived, visibly upset, and instructed Elliott and Hall to remain in the lobby while Owens went into Judge Norris's office. A deputy stood in the only apparent doorway. With his lip quivering and hands shaking, Judge Norris instructed Owens to "sit down and listen to what I have to say." In a raised voice, Judge Norris began reading from the statutory bondsman code of conduct, which he had printed out in preparation for the meeting. Becoming nervous, Owens requested to have his lawyer present, but Judge Norris ignored this request. Instead, Judge Norris allowed Elliott and Hall to come into his office, and Owens asked them to witness that he wanted to leave or have his attorney present. Owens felt that he was not free to leave, sat quietly, and did not respond to Judge Norris's berating. Ultimately, Judge Norris went on for about 30 minutes, chastising and lecturing Owens, implying that Owens did not have "good moral character," insinuating that Judge Norris had the power to affect Owens's livelihood as a bondsman, and

3

reprimanding Owens for attacking him online and spreading "fake news" about the rape case.

Owens subsequently filed a complaint against Judge Norris with the JQC. After an investigation, the Director of the JQC filed formal charges against Judge Norris on May 12, 2020, alleging that Judge Norris violated Article VI, Section VII, Paragraph VII of the Georgia Constitution of 1983, along with Canon 1 and Rules 1.2 (A), 1.3, and 2.8 (B) of the Georgia Code of Judicial Conduct. Judge Norris and the Director subsequently negotiated a proposed settlement to resolve these charges pursuant to a JQC Rule 23 discipline-by-consent agreement, which the Panel submitted to this Court for review. However, on August 24, 2020, this Court rejected the consent agreement, with direction to the JQC, in a confidential order. See Rule 23 (D).

On March 31, 2021, the Director filed superseding formal charges against Judge Norris, which asserted violations of Rule 1.2 (A) and Rule 2.8 (B) of the Code of Judicial Conduct based on his

meeting with Owens.[1] On November 22 and 23, 2021, the Panel held a public hearing on the formal charges. See JQC Rule 24 (C). The Panel submitted its report and recommendation to this Court on February 3, 2022, with the majority and the dissent disagreeing on the appropriate sanction. However, both the majority and the dissent agreed on the factual findings and the legal conclusions that Judge Norris had violated both Rules 1.2 (A) and Rule 2.8 (B) and that discipline is warranted because there was clear and convincing evidence that Judge Norris engaged in "willful misconduct in office" and in conduct "prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. Const. of 1983, Art. VI, Sec. VII, Par. VII (a); see also JQC Rules 6 (A) (1) and (5). Specifically, the Panel reasoned that the evidence showed that the meeting was not a "sudden unplanned encounter in which Judge

---

[1] Rule 1.2 (A) requires judges to "act at all times in a manner that promotes public confidence in the *independence*, *integrity*, and *impartiality* of the judiciary." Rule 2.8 (B) requires judges to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity." The Director did not allege any charges based on Judge Norris's discussion about an ongoing case. See Rule 2.9 (A).

Norris unexpectedly and spontaneously lost his temper"; instead, the meeting was "deliberate and largely premeditated" and went on for 30 minutes, despite Owens's request to leave or have an attorney present.

The JQC Director filed a notice of exceptions, objecting only to the Panel's recommendation for a public apology and arguing for a sanction of a public reprimand; Judge Norris did not file a notice of exceptions, thereby accepting the Panel's factual findings and legal conclusions. See JQC Rule 24 (F). This matter is now ripe for decision. See JQC Rule 25 (D) (1).

2. Because all of the parties agree that Judge Norris violated Rules 1.2 (A) and 2.8 (B) and that discipline is warranted, and our review of the record supports those conclusions,[2] the question that

---

[2] Although the Panel Report stated that judges must bear public criticism "with grace (or at least stoicism)," we note that a judge's defense of himself and his reputation against public criticism is not necessarily, on its own, a rule violation. Elected judges are afforded First Amendment protections, at least with regard to their campaign activities. See e.g., *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 443 (II) (135 SCt 1656, 191 LE2d 570) (2015) ("[S]peech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection."). However, Judge Norris went beyond simply defending his reputation, using his

remains is the appropriate discipline to be imposed in this case. In its recommendation of a public apology to Owens, the Panel majority points to JQC Rule 6 (B) (8), which provides that "other appropriate disciplinary action" may be levied against a respondent who has committed judicial misconduct. The Panel majority asserts that, because Judge Norris already had a public hearing in which he acknowledged his mistakes and misconduct, a public reprimand would carry less weight and thus a public apology is more appropriate. We disagree. See JQC Rule 25 (D) (2) (This Court "may accept, reject, or modify in whole or in part the findings and conclusions of the Hearing Panel.").

Georgia cases imposing discipline for non-habitual acts of intemperance, violating Rules 1.2 (A) and 2.8 (B), have involved yelling, vulgar language, or improper physical contact, along with other rule violations, and sanctions have ranged from a public reprimand to a 30-day suspension. See *Inquiry Concerning Judge*

---

power and authority as a judicial officer to summon Owens to his chambers for a meeting, to threaten and intimidate Owens, and to discuss a pending case.

*Cary Hays III*, 313 Ga. 148, 149-50 (868 SE2d 792) (2022) (imposing 30-day suspension and public reprimand for judge's Rule 1.1, 1.2 (A), and 2.8 (B) violations; intemperate conduct violating Rule 2.8 (B) was judge's verbal exchange with the defendant followed by judge physically "grabbing [the defendant] and pushing him against the wall"); *Inquiry Concerning Judge Eddie Anderson*, 304 Ga. 165, 166, 168 (816 SE2d 676) (2018) (imposing public reprimand where respondent "yelled" at litigant and "threatened [him] with an adverse judgment and court costs if litigation ensued"); *In re Broome*, 245 Ga. 227, 227-28 (264 SE2d 656) (1980) (ordering 30-day suspension where respondent "used derogatory language" towards another judge from the bench and proceeded to go into the other judge's office and "berate[] and abuse[] him with vulgar and obscene language which was heard by several other persons"). We have not found, and the Panel majority does not cite, any judicial discipline case in Georgia in which a public apology has been imposed as a

8

sanction.[3]

While we are also unable to find a Georgia case where a respondent like Judge Norris exhibited planning or pre-meditation before his or her intemperate behavior, courts in other jurisdictions have imposed a range of sanctions against judges for acts of intemperance where the conduct required some planning, including public reprimand, censure, and suspension. For example, in *In re Hair*, 436 SE2d 128 (N.C. 1993), the judge called a lawyer into his chambers and, in an angry tone, reprimanded him because the lawyer's firm was assisting the judge's wife in divorce proceedings against him. See id. at 153. A year later, following a hearing which concluded his divorce case, the judge confronted two standby witnesses inside the district attorney's office, "stat[ing] to [the standby witnesses] in an angry, trembling voice while pointing his finger in their direction that he did not appreciate their not

---

[3] It is not surprising that no Georgia disciplinary case has required a public apology as a sanction because a compelled apology is not listed as a potential sanction in the JQC Rules; rather, the Panel majority decided to fashion a sanction pursuant to the catchall "other appropriate disciplinary action" provision in JQC Rule 6 (B) (8).

9

testifying[,] which he considered disloyal." Id. at 152. The North Carolina Supreme Court imposed a censure for this conduct which violated several rules, including North Carolina's version of our Rule 2.8 (B). See also *Office of Disciplinary Counsel v. Hoague*, 725 NE2d 1108, 1110 (Ohio 2000) (imposing a six-month suspension for the judge's one-time misuse of the authority of his office where he observed reckless driving and proceeded to, "[o]n court letterhead, . . . ma[k]e false statements to intimidate [the car's driver and passenger] into appearing before him so that he could personally reprimand them"; suspension was stayed provided that the judge engage in no further code violations)[4]; *In re Cox*, 532 A2d 1017, 1018 (Me. 1987) (imposing a reprimand for the judge's violation of the Maine canon similar to our Rule 2.8 (B), along with other code violations, where the judge called the police officer handling his son's criminal case into his chambers and proceeded to "shout and swear"

---

[4] Notably, *Hoague* was a divided decision of the Ohio Supreme Court, with five justices concurring in the stayed sentence and three justices who would have imposed a public reprimand.

at the officer). However, we have not found any cases in which a public apology, without more, has been imposed for similar conduct.[5]

Likewise, although the dissent to the Panel's recommendation asserts that a censure should be imposed, the dissent does not cite any authority other than the JQC rules for imposing that discipline.[6] Only one reported decision of our Court, issued under the previous version of the JQC Rules, mentions censure as a form of discipline, but it is unclear whether a censure was ultimately imposed in that case as the Court ordered that "a letter of admonition be written to the respondent by the Chief Justice of this Court." *In re Judge No. 490*, 249 Ga. 428, 429 (291 SE2d 547) (1982). Moreover, other than *In re Hair*, 436 SE2d at 131, discussed above, and *In re Inquiry*

---

[5] The Florida Supreme Court has ordered that judges write personal letters of apology to each of the attorneys or parties that they offended by their intemperate conduct, but the court also required a public reprimand in each of those cases. See, e.g., *In re Contini*, 205 S3d 1281, 1285 (Fla. 2016); *In re Shea*, 110 S3d 414, 419 (Fla. 2013); *Inquiry Concerning a Judge (Schapiro)*, 845 S2d 170, 174 (Fla. 2003).

[6] The terminology section of the JQC Rules defines censure as "a reprimand by the Supreme Court in the form of written decision which shall be imposed by the Supreme Court on the judge in person in open court." "[C]ensure by the Supreme Court" is then listed as a potential sanction that may be imposed for misconduct. JQC Rule 6 (B) (4).

11

*Concerning a Judge*, 195 S3d 1129, 1130-32 (Fla. 2016), where the Supreme Court of Florida ordered the respondent judge "to appear before [the court] for the administration of a public reprimand" for the respondent's "berat[ing] and belittle[ing]" of a domestic violence victim who failed to respond to a subpoena to testify against her abuser, we have not found any other cases where a censure or similar sanction before a state supreme court has been imposed.

Here, Judge Norris's violations were based on non-habitual conduct, with no evidence that he used vulgar language or engaged in any sort of physical altercation on the occasion in question. But Judge Norris's deliberate and conscious planning of this confrontation is particularly problematic, as his misconduct was not the result of a sudden or brief loss of temper. In fact, Owens's Facebook post was posted a full five days before the meeting with Judge Norris, Judge Norris had to reach out to another bondsman to get in contact with Owens, Owens and Judge Norris exchanged multiple texts to arrange the meeting, Judge Norris set the meeting in his chambers, during business hours, Judge Norris printed out

the statutory bondsman code of conduct, and then Judge Norris delivered an angry 30-minute monologue in a raised voice while Owens was required to sit and listen with an armed deputy standing in the doorway. Judge Norris also denied Owens's request to leave or have an attorney present and intimated that Judge Norris could harm Owens's position as a bail bondsman. Moreover, Judge Norris "offered various justifications for his meeting with Owens," but the Panel found the testimony "inconsistent and contradicted by other evidence." Panel Report at 10. Thus, unlike the judge in *Hays*, Judge Norris has not fully accepted responsibility for this incident.

In mitigation, the Panel considered Judge Norris's long record of "honorable public and military service," as well as the fact that Judge Norris seems to be well-respected in his chambers, among his peers, and "generally in the Athens community." Panel Report at 16. Moreover, the Panel found that "this case appears to have been a lone (but significant) incident." Id.

However, as noted in the Panel Report and Dissent, Judge

Norris has not apologized to Owens for his conduct,[7] and to the contrary, Judge Norris has offered a number of excuses for the meeting, which the Panel did not find to be credible. Judge Norris's failure to apologize to Owens on his own initiative suggests that a public apology compelled by this Court, even if permissible, would be insincere at best.[8] Cf. *Hays*, 313 Ga. at 150 (noting that the judge

---

[7] Judge Norris did apologize to one of the other bail bondsmen who witnessed his tirade.

[8] We note that Judge Norris does not raise any objection to a compelled public apology under the First Amendment or its analogue in the Georgia Constitution, and we do not express any opinion on that issue here. Compare *United States v. Clark*, 918 F2d 834, 848 (9th Cir. 1990) (holding that the requirement of a public apology, as a probation condition, was "reasonably related to the permissible end of rehabilitation" and therefore "not an abuse of discretion" which would violate the First Amendment); *State v. K.H.-H.*, 353 P3d 661, 666 (Wash. Ct. App. 2015) (requiring defendant to write a letter of apology to the victim "did not violate [the defendant's] First Amendment rights" because "the juvenile court imposed the challenged condition [i.e., the apology] for the purpose of rehabilitat[ion]") with *Dahn v. Adoption Alliance*, 164 FSupp. 3d 1294, 1318 (D. Colo. 2016) (declining to grant plaintiff's request for injunctive relief in the form of a public apology because that "remedy would be inappropriate in this case," particularly in light of "the constitutional implications attendant to enjoining a party to make statements that may run contrary to his or her beliefs"), rev'd on other grounds, 867 F3d 1178 (10th Cir. 2017); *Defend Affirmative Action Party (DAAP) v. Regents of Univ. of Cal.*, Case No. 16-cv-01575-VC, 2016 U.S. Dist. LEXIS 60085, at *2 (N.D. Cal. May 4, 2016) ("A court order requiring an apology would, in addition to being ridiculous, almost certainly be a First Amendment violation of its own."); *K.H.-H*, 353 P3d at 667 (Bjorgen, A.C.J., dissenting in part) (asserting that "requiring [the defendant] to write a letter of apology and confession offends the First Amendment").

14

had "forthrightly accepted full responsibility for this isolated, but serious, incident").

On the other hand, we have found no Georgia authority – and only two cases in other jurisdictions – requiring a censure under circumstances similar to these. The JQC Rules contemplate that a censure by this Court is similar to a public reprimand, with the difference being the court imposing the reprimand. See Terminology section of the JQC Rules (defining "Censure" as a reprimand "which shall be imposed by the Supreme Court on the judge in person in open court" and "Public Reprimand" as a reprimand "which shall be imposed in person in open court by a judge selected by the Supreme Court"). Thus, in our view, censure should generally be reserved as a sanction for judges of statewide jurisdiction, while a public reprimand imposed in a local court within the community is more appropriate for trial court judges of limited geographic jurisdiction.

For these reasons, the Court concludes that neither a public apology nor a censure is an appropriate sanction and orders that Judge Norris receive a public reprimand, which shall be imposed on

15

him in person in open court by a judge designated by this Court. See

*Hays*, 313 Ga. at 150; *Anderson*, 304 Ga. at 168.

*Public reprimand. All the Justices concur, except LaGrua, J., who concurs in the judgment only. Colvin, J., disqualified.*