IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 87073-4-I |
| Alfredo Carreno-Maldonado, | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

COBURN, J. — In his personal restraint petition (PRP), Alfredo Carreno-Maldonado challenges the determination of the Indeterminate Sentencing Board (ISRB) that he is not releasable.

Carreno-Maldonado is a citizen of Mexico. In 2004 he pleaded guilty to one count of rape in the first degree, five counts of rape in the second degree, and one count of assault in the second degree. In 2007 the trial court resentenced[1] Carreno-Maldonado to an indeterminate sentence of 240 months to life under former RCW 9.94A.712 (2004), which then governed sentencing for nonpersistent sex offenders. The statute requires Carreno-Maldonado to have lifetime community supervision by the Department

---

[1] Carreno-Maldonado was initially sentenced to 318 months to life, including a lifetime supervision in the community. Carreno-Maldonado subsequently appealed his convictions to this court, arguing that the State breached his plea agreement. State v. Carreno-Maldonado, 135 Wn. App. 77, 82, 143 P.3d 343 (2006). We agreed, id. at 88-89, and on remand the trial court resentenced Carreno-Maldonado to 240 months to life on the six rape counts with a lifetime term of supervision in the community.

of Corrections (DOC) if released from confinement.[2] Former RCW 9.94A.712(3), (5) (2004). Four days after his resentencing, the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE) issued a federal immigration detainer subjecting Carreno-Maldonado to deportation proceedings if he is released from prison.[3]

Upon completing his minimum 240-month term of confinement in December 2021, Carreno-Maldonado became eligible for his first releasability hearing before the ISRB under RCW 9.95.420 (.420 hearing). See former RCW 9.94A.712(4) (2004); RCW 9.95.420(3). The ISRB has since held two .420 hearings to consider his early release. The ISRB denied release each time. Carreno-Maldonado was not represented by an attorney at either hearing.

Carreno-Maldonado makes several constitutional claims. He argues that (1) the ISRB violated his equal protection rights by recognizing the existence of his immigration detainer, (2) he was not permitted attorney representation at his .420 hearings in violation of equal protection, and (3) the ISRB subjected him to cruel punishment by recognizing that his immigration detainer prevented him from being subject to community supervision in its determination to not grant him early release from his life

---

[2] The statute governing sentencing for nonpersistent sex offenders has since been recodified as RCW 9.94A.507. LAWS OF 2008, ch. 231, § 56. Because it was the applicable version at the time of Carreno-Maldonado's sentencing, we apply former RCW 9.94A.712 (2004).

[3] It is undisputed that Carreno-Maldonado remains under an ICE detainer, that he would be transferred to ICE custody if he was released from DOC confinement, and that his convictions render him deportable under federal law. 8 U.S.C. §1227(a)(2)(A)(ii). Every noncitizen in DOC custody is subject to deportation under federal law. See 8 U.S.C. § 1227(a)(2)(A)(i)(I).

sentence.[4] Lastly, Carreno-Maldonado also avers that the ISRB abused its discretion by failing to meaningfully consider potential release conditions. We disagree with Carreno-Maldonado as to the constitutional challenges. However, we agree that the ISRB abused its discretion in its failure to meaningfully consider release conditions at his second .420 hearing. To remedy this error, we reverse and remand for the ISRB to conduct a new .420 release hearing in accordance with this opinion.

FACTS

At Carreno-Maldonado's first .420 release hearing on October 25, 2022, the ISRB heard testimony regarding his release plan wherein he stated that he wanted to be deported to Mexico. If not deported, Carreno-Maldonado planned to live with family in Tacoma and "follow all conditions as set forth by the [ISRB] and by DOC." Carreno-Maldonado stated, "I'm gonna be deported for life, and I can never come back" and confirmed he understood that he has a life sentence.

On November 14 the ISRB issued its first written order (2022 decision) determining that Carreno-Maldonado was not releasable. The ISRB found that any community custody conditions and any favorable evidence would not sufficiently reduce the likelihood that Carreno-Maldonado would commit new sex offenses if released.

---

[4] We note that Carreno-Maldonado did not raise the attorney representation and cruel punishment issues in his PRP filed in December 2020. These issues were first raised in appointed appellate counsel's supplemental brief filed in support of Carreno-Maldonado's petition.

Pursuant to RAP 16.11(b), an acting chief judge of our sister division determined that the issues raised in Carreno-Maldonado's petition were not frivolous and referred the petition to a panel of judges for determination on the merits. The matter was then transferred to this court. RAP 16.11(b) serves as a gatekeeping function to ensure that finite judicial resources are not exhausted on baseless claims. However, we observe that the acting chief judge's order did not expressly limit appointed counsel's representation to the issues raised in Carreno-Maldonado's petition. For this reason, we exercise our discretion to address the additional issues on their merits. See RAP 1.2(a).

In support of its determination, the ISRB found that Carreno-Maldonado was assessed by the End of Sentence Review Committee (ESRC) to be a high-risk level 3 sex offender. Earlier, on July 7, 2022, the ESRC Sexually Violent Predator (SVP) Subcommittee recommended that prior to consideration for release Carreno-Maldonado receive a forensic psychological evaluation (FPE) to assess whether he meets civil commitment criteria as a sexually violent predator (SVP) under RCW 71.09.020.[5] The ISRB explained that "[o]nly a small percentage of the highest risk sex offenders are reviewed for and selected by the ESRC SVP Subcommittee for an FPE, indicative of the risk Mr. Carreno-Maldonado presents at this time."

In terms of treatment, the ISRB found that Carreno-Maldonado completed the institution portion of DOC's Sex Offender Treatment and Assessment Program (SOTAP) during his confinement but was unable to complete the community portion due to his immigration detainer. The ISRB stated that it "considered all potential conditions of community custody it may lawfully impose, including all potential conditions[6] identified by the [ESRC], DOC psychological evaluations, the Judgement and Sentence, and RCW 9.94A.704."[7] The ISRB found that Carreno-Maldonado "has an ICE detainer

---

[5] RCW 71.09.020(19) defines a "sexually violent predator" as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."

[6] Among others, the order stated that these conditions include, but are not limited to, electronic monitoring, geographic restrictions, and participation in sex offender treatment.

[7] RCW 9.94A.704 provides in relevant part:

(1) Every person who is sentenced to a period of community custody shall report to and be placed under the supervision of the department, subject to RCW 9.94A.501.

…

(3) If the offender is supervised by the department, the department shall at a minimum instruct the offender to:

(a) Report as directed to a community corrections officer;

(b) Remain within prescribed geographical boundaries;

to Mexico and will not have any Conditions of Supervision if deported. Therefore, without Conditions he will be at a higher risk to the community without supervision." In conclusion, based on its "weighing [of] all the evidence," Carreno-Maldonado was more likely than not to commit new sex offenses if released into the community. The ISRB added 36 months to Carreno-Maldonado's minimum term.

Carreno-Maldonado timely filed this PRP, asserting that he was not appointed counsel for his release hearing in violation of equal protection, that the ISRB's decision unlawfully discriminated against him and subjected him to cruel punishment, and that the ISRB abused its discretion by finding him not releasable without meaningfully addressing his potential conditions of release.

While this PRP was pending, the ISRB conducted Carreno-Maldonado's second .420 release hearing in May 2024[8] and issued a new decision the following month

---

(c) Notify the community corrections officer of any change in the offender's address or employment; and

(d) Disclose the fact of supervision to any mental health, chemical dependency, or domestic violence treatment provider, as required by RCW 9.94A.722.

(4) The department may require the offender to participate in rehabilitative programs, or otherwise perform affirmative conduct, and to obey all laws.

(5) If the offender was sentenced pursuant to a conviction for a sex offense or domestic violence, the department may:

(a) Require the offender to refrain from direct or indirect contact with the victim of the crime or immediate family member of the victim of the crime. If a victim or an immediate family member of a victim has requested that the offender not contact him or her after notice as provided in RCW 72.09.340, the department shall require the offender to refrain from contact with the requestor. Where the victim is a minor, the parent or guardian of the victim may make a request on the victim's behalf. This subsection is not intended to reduce the preexisting authority of the department to impose no-contact conditions regardless of the offender's crime and regardless of who is protected by the no-contact condition, where such condition is based on risk to community safety.

(b) Impose electronic monitoring. Within the resources made available by the department for this purpose, the department shall carry out any electronic monitoring using the most appropriate technology given the individual circumstances of the offender.

[8] If the ISRB does not order the offender released, it shall set a new minimum term not to exceed an additional five years, and also review the person again not less than 90 days prior to the expiration of the new minimum term. RCW 9.95.011(2)(a). In its 2022 decision, the ISRB

concluding again that he was not releasable. Carreno-Maldonado was not represented by an attorney at either of his .420 hearings.

At Carreno-Maldonado's 2024 hearing, the ISRB heard testimony from a DOC classification counselor that, in the context of release planning, Carreno-Maldonado "has an ICE detainer. But if able to release to Washington, he wishes to release to his brother in Tacoma." Carreno-Maldonado confirmed during his testimony that he has an immigration detainer and would likely be released to Mexico. Carreno-Maldonado wanted to participate in the DOC treatment program "Thinking for a Change" but was unable to due to his immigration detainer. When asked if he would live near his family in Mexico, Carreno-Maldonado answered,

> So, when immigration ah, when you go through deportation, they just throw you in like literally in the border, and it's up to you to go wherever you want to-
> ….
> I've been in this prison for so long. I've been incarcerated for so many years. I have no more, no more time to waste, so I'm just going to run to my family and be special with my grandmas who are advanced in age, and I want to be with them for the rest of their days.

The ISRB informed Carreno-Maldonado at the hearing that since ESRC has requested an FPE be completed, the ISRB

> will not find you releasable today. What we'll do is we'll talk about it and if we think you're a good candidate for release, we will ask for that evaluation to be done soon. If we … don't find you're … a good candidate for release, we will add time to your minimum term and we will not ask for the evaluation to be done yet. I want you … to understand if we don't find you releasable and we don't ask for an [FPE] now, it's going to be really important that you continue to do well in prison … [to show] you've made good progress.

---

noted that his next hearing would be scheduled 120 days prior to his new early release date. Notably, the ISRB held Carreno-Maldonado's second .420 hearing significantly ahead of either of these timelines.

On June 24, 2024,[9] the ISRB issued its decision (2024 decision), again determining Carreno-Maldonado was not releasable.

In the 2024 decision, the ISRB states that it considered evidence presented at the hearing, Carreno-Maldonado's ESRC report (dated March 25, 2024), criminal case records, DOC records, Carreno-Maldonado's individual release plan, risk assessments, and its 2022 decision. The 2024 decision indicates that the ISRB did not consider any psychological evaluations.

In the 2024 decision, the ISRB describes Carreno-Maldonado's violent offenses that occurred across several months in 2004 and consisted of physically and sexually assaulting six unknown female victims:

> [Carreno-Maldonado] picked each [victim] up in the same part of town and took them to the same empty lot to assault them. He threatened several victims with a knife, strangled several of them while sexually assaulting them and penetrated one with a screwdriver. He picked up an unknown 40-year-old female and took her to the same lot. When she questioned him, he sprayed her with pepper spray. Nonetheless she escaped. Documents indicate that Mr. Carreno-Maldonado's intention was to sexually assault this victim as well, but he was not successful.

As to release conditions, the ISRB's order stated it "considered all potential conditions of community custody it may lawfully impose" including, but not limited to, the following:

- DRUG / ALCOHOL RESTRICTIONS
- PARTICIPATION IN DRUG/ALCOHOL TREATMENT
- PARTICIPATION IN SEX OFFENSE TREATMENT
- PROHIBITED CONTACTS
- SEXUALLY EXPLICIT MATERIAL
- SUBMIT TO POLYGRAPHS
- UNAPPROVED RELATIONSHIPS

---

[9] Originally issued in June 2024, ISRB amended its decision in December 2024 to correct scrivener's errors.

The ISRB determined that the community custody options and any favorable evidence[10] did not sufficiently reduce the likelihood that Carreno-Maldonado would commit new sex offenses if released.

In support of its determination, the ISRB found that the ESRC assessed Carreno-Maldonado as a Level III sex offender[11] and that his risk assessments indicate he is at high risk of reoffense. Additionally, the ISRB based its determination on the fact that Carreno-Maldonado was

> assessed by the ESRC SVP Subcommittee as needing … [an FPE] which must occur before he can be considered for release. The FPE will provide the [ISRB] with important information to be considered as part of a release decision. Only a small percentage of the highest risk sex offenders are reviewed for, and selected by the ESRC SVP Subcommittee for an FPE, indicative of the risk Mr. Carreno-Maldonado presents at this time.

The ISRB found that Carreno-Maldonado is more likely than not to commit new sex offenses if released regardless of potential release conditions. The ISRB added 18 months to his minimum term.

In the 2024 decision, the ISRB also recommended Carreno-Maldonado to participate in an FPE. For its "[n]ext action," the ISRB stated that it would schedule a .420 hearing approximately 120 days prior to the new release date and emphasized that "[t]he completed FPE will need to be forwarded to the [ISRB] prior to the hearing." In its summary, the ISRB explained that it "will notify the ESRC that the previously recommended [FPE] should be completed prior to the next hearing."

---

[10] In support of Carreno-Maldonado's release determination, the ISRB considered his completion of SOTAP and substance use disorder treatment and that he "[h]as demonstrated overall positive behavior in prison."

[11] The ESRC "shall classify as risk level III those offenders whose risk assessments indicate they are at a high risk to sexually reoffend within the community at large." RCW 72.09.345(6).

Following the 2024 decision, the ISRB moved to dismiss Carreno-Maldonado's PRP as moot and to strike oral argument. Carreno-Maldonado filed an answer objecting to the motion and also separately requested permission to add challenges to the 2024 decision. We denied the ISRB's motion and granted Carreno-Maldonado's request and motion to file an addendum to his supplemental PRP.

DISCUSSION[12]

Legal Principles

To succeed on a PRP challenge of an ISRB decision, the petitioner must show unlawful restraint. In re Pers. Restraint of Dyer, 164 Wn.2d 274, 285, 189 P.3d 759 (2008) (Dyer II) (citing RAP 16.4(b), (c)). Carreno-Maldonado is restrained based on his incarceration. RAP 16.4(b). Although the ISRB has broad discretion, its release decisions must nonetheless comply with state and federal law. In re Pers. Restraint of Parejo, 5 Wn. App. 2d 558, 571, 428 P.3d 130 (2018). An incarcerated person may establish unlawful restraint by showing the ISRB's denial of release and extension of the petitioner's minimum sentence was in violation of statute, regulation, or the U.S. or Washington constitutions. RAP 16.4(c)(2); In re Pers. Restraint of Cashaw, 123 Wn.2d 138, 140, 866 P.2d 8 (1994).

Carreno-Maldonado's sentence is governed by the indeterminate sentencing provisions of chapter 9.95 RCW, which authorizes the sentencing court to impose the offender's minimum and maximum sentence and the ISRB to determine whether and

---

[12] Because the ISRB withdrew its mootness argument at oral argument, we do not address it. Wash. Court of Appeals oral argument, In re Pers. Restraint of Carreno-Maldonado, No. 87073-4-I (Mar. 6, 2025), at 18 min., 25 sec. through 18 min., 28 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025031227/.

when the offender is to be released. See RCW 9.95.420; In re Pers. Restraint of Forcha-Williams, 200 Wn.2d 581, 593, 597-98, 520 P.3d 939 (2022). Under RCW 9.95.420(3)(a),

> no later than ninety days before expiration of the [incarcerated person's] minimum term, but after the [ISRB] receives the results from the end of sentence review process and the recommendations for additional or modified conditions of community custody from the department, the [ISRB] shall conduct a hearing to determine whether it is more likely than not that the offender will engage in sex offenses if released on conditions to be set by the [ISRB].

RCW 9.95.420(3)(a). The ISRB "shall order the offender released" with conditions that it deems appropriate unless the ISRB "determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the offender will commit sex offenses if released." RCW 9.95.420(3)(a).

Equal Protection

A. *ISRB's Consideration of Immigration Detainer*

Carreno-Maldonado contends that the ISRB violated his state and federal equal protection rights by considering his "noncitizen" status in its denial of his release. Carreno-Maldonado seems to suggest that his purportedly different treatment as a noncitizen compels the ISRB's decision to be strictly scrutinized. He asserts that discrimination against noncitizens is not the least restrictive means to achieving a compelling state interest. We conclude that because Carreno-Maldonado does not establish that the ISRB treated him differently than similarly situated persons because of his citizenship status, he fails in his burden to raise a viable equal protection claim.

The federal and Washington constitutions guarantee equal protection under the law by prohibiting governmental classifications that impermissibly discriminate among

10

similarly situated groups. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 12. The Washington Supreme Court has held that the equal protection clauses of the Fourteenth Amendment and article I, section 12 of the Washington Constitution "are substantially identical and subject to the same analysis." State v. Osman, 157 Wn.2d 474, 483 n.11, 139 P.3d 334 (2006). "Both require that persons similarly situated with respect to the legitimate purpose of the law be similarly treated." State v. Shawn P., 122 Wn.2d 553, 560, 859 P.2d 1220 (1993).

When evaluating an equal protection claim, a court must first determine whether the individual claiming the violation is similarly situated with other persons. Osman, 157 Wn.2d at 484. "A defendant must establish that he received disparate treatment because of membership in a class of similarly situated individuals and that the disparate treatment was the result of intentional or purposeful discrimination." Id. Equal protection does not require the State to treat all persons identically. Id. Rather, any classification that results in varied treatment "must be relevant to the purpose for the disparate treatment." Id.

The classification determines the standard of review the court applies to a challenged government action. Id. "One of three standards will be applied, depending on the nature of the interest affected or on the characteristics of the class." Shawn P., 122 Wn.2d at 560. Courts apply strict scrutiny, the highest level of scrutiny, if the petitioner is a member of a suspect class or the challenged state action threatens a fundamental right. Osman, 157 Wn.2d at 484; State v. Schaaf, 109 Wn.2d 1, 17-18, 743 P.2d 240 (1987). "Under the strict scrutiny test, a law may be upheld only if it is shown to be necessary to accomplish a compelling state interest." Schaaf, 109 Wn.2d at 17.

Intermediate scrutiny applies "if the individual is a member of a 'semisuspect' class or the state action threatens 'important' rights," which requires that the challenged state action further a substantial interest of the state. Osman, 157 Wn.2d at 484; Schaaf, 109 Wn.2d at 17. Courts apply rational basis, the lowest level of scrutiny, where the state action does not threaten a fundamental or important right or the individual is not a member of a suspect or semisuspect class. Osman, 157 Wn.2d at 484; Shawn P., 122 Wn.2d at 560.

In Osman, 157 Wn.2d at 484-85, the Supreme Court observed in respect to how courts have reviewed equal protection challenges based on noncitizen classifications:

> Although we generally subject restraints on the rights of aliens to strict scrutiny, courts have placed some limits on their equal protection rights. Foley v. Connelie, 435 U.S. 291, 294, 98 S. Ct. 1067, 55 L. Ed. 2d 287 (1978). Courts subject state action to strict scrutiny if it excludes aliens, as a class, from education benefits and the ability to practice a licensed profession. Id. at 295, 98 S. Ct. 1067. However, courts have applied rational basis when reviewing state action relating to the right to vote, running for elective office, holding important nonelective positions, or working as a police officer. Id. at 296-98, 98 S. Ct. 1067. In addition, classifications among aliens are generally subject to the less stringent rational basis review. Mathews v. Diaz, 426 U.S. 67, 78-79, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976) (recognizing that not all aliens are members of the same legal classification because "the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country[]"); Angulo-Dominguez v. Ashcroft, 290 F.3d 1147, 1151 (2002). Illegal aliens are not members of a suspect class and courts have consistently subjected restrictions of their rights to rational basis review. Plyler v. Doe, 457 U.S. 202, 219 n.19, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982).

Osman, 157 Wn.2d at 484-85.

In Osman, the Supreme Court considered Osman's equal protection challenge to a Court of Appeals decision that upheld the trial court's imposition of a standard range sentence under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. 157

Wn.2d at 477. Osman argued that the trial court's denial of his request for a sentence under the special sex offender sentencing alternative (SSOSA)[13] based on his possible deportation was an unconstitutional application of the SRA in violation of his state and federal equal protection rights. Id.; see former RCW 9.94A.120(8)(a) (2000), recodified as RCW 9.94A.670(4) by LAWS OF 2000, ch. 28, §§ 5, 20.

Osman's presentence investigation report stated he was eligible for a SSOSA but recommended a standard range sentence. Osman, 157 Wn.2d at 477-78, 477 n.2. The report recommended against a SSOSA if there was a possibility that Osman could be deported before he could receive treatment. Id. at 478. The report also "stated that if the defense could demonstrate the non-possibility of deportation and if Osman was amenable to treatment, there were no objections to a SSOSA." Id. (internal quotation marks omitted). At the sentencing hearing, the state expressed its main concern "that if Osman was deported, he would not undergo treatment nor would he receive adequate punishment." Id. The trial court denied Osman's request for a SSOSA, expressing its concern about the possibility that Osman would not receive treatment or punishment if deported. Id. at 479. Osman argued that the trial court improperly based its denial of a SSOSA on his alienage status. Id. at 480.

The Supreme Court affirmed the trial court's decision and observed that although Osman claimed the trial court treated him differently because of his status as an alien, he did not show how his treatment differed from the treatment of others or "with whom

---

[13] "A SSOSA is a special sentencing alternative that may be available for some people convicted of sex crimes who meet statutory criteria." Osman, 157 Wn.2d at 477 n.3 (citing former RCW 9.94A.120(8)). "Under former RCW 9.94A.120(8), a person who was given a SSOSA could receive a sentence of up to six months in jail and treatment of up to three years." Osman, 157 Wn.2d at 477 n.3.

he is similarly situated." Id. at 485-87. "He does not indicate whether his claim is based on different treatment as compared to a citizen or as compared to another alien, subject to deportation or not subject to deportation." Id. at 485. The court concluded that the trial court permissibly denied "Osman's request for a SSOSA because Osman's circumstances could prevent him from complying with the SSOSA treatment requirements." Id. at 487.

Additionally, the Supreme Court determined that Osman did not establish his membership in a suspect class based on his deportable alien status and that he did not have a fundamental right to early release from confinement. Id. at 485-87 (citing Jiminez v. Coughlin, 501 N.Y.S.2d 539, 542, 117 A.D.2d 1, 4-5 (N.Y. App. Div. 1986)). Applying rational basis review, the Supreme Court held that the trial court's denial of a SSOSA based on its concern that Osman would not be able to comply with treatment requirements "was rationally related to the SRA's goal of ensuring standardized sentencing." Id. at 486-87.

In the instant case, to establish a viable equal protection claim, Carreno-Maldonado must first establish his classification by showing he was treated differently from others who were similarly situated based on his noncitizen status. See id. at 484-85. Carreno-Maldonado specifically argues that because a noncitizen sex offender's deportation status precludes participation in certain programs or community custody conditions[14] that the ISRB may consider in evaluating whether an offender's risk of reoffending in the community can be adequately mitigated, every noncitizen offender is at a disadvantage in obtaining release compared to a "similarly situated" citizen offender

---

[14] Such as DOC's Thinking for a Change program and the community-based portion of the SOTAP.

"with an identical offense history, sentence, and risk of recidivism." Carreno-Maldonado asserts that by considering his inability to participate in treatment or community custody conditions, the ISRB discriminated against him based on his status as a noncitizen.

However, like Osman, the ISRB did not base its denial of release on Carreno-Maldonado's noncitizen status or the mere fact that he has an immigration detainer. Rather, the ISRB recognized that Carreno-Maldonado's immigration detainer interfered with his ability to comply with DOC supervision and release conditions.

Under RCW 9.95.420(3)(a), the ISRB must "determin[e] by a preponderance of the evidence [whether], despite [release] conditions, it is more likely than not that the offender will commit sex offenses if released" Into the community. The statute does not identify the offender's citizenship status as a factor to be considered. Rather, the law requires the ISRB to impose conditions of community custody to reduce the risk of a sex offender's reoffense and requires the released offender to be placed under DOC supervision. See RCW 9.95.420(2)-(3); RCW 9.94A.704(1); see also WAC 381-90-150(1), (3) (authorizing the ISRB to consider a list of non-exclusive factors to determine whether "the incarcerated individual will commit another sex offense if released to the community" under RCW 9.95.420). At minimum, DOC must instruct the offender to report as directed to a community corrections officer, remain within defined geographical boundaries, report any change in address or employment, and disclose such supervision to any mental health, chemical dependency, or domestic violence treatment provider. RCW 9.94A.704(3); .722. These requirements apply to all ISRB-eligible sex offenders regardless of citizenship. See RCW 9.94A.704(2)(a) (stating that

DOC "shall assess the offender's risk of reoffense and may establish and modify additional conditions of community custody based upon the risk to community safety").

Here, as evidenced by its 2022 decision, the ISRB found that because Carreno-Maldonado has an immigration detainer, he would not have any community supervision if deported to Mexico. The ISRB concluded that without community supervision, Carreno-Maldonado "will be at a higher risk to the community."

The ISRB thus, according to its statutory duty, evaluated Carreno-Maldonado's particular risk of reoffending based in part on his individual ability to comply with DOC supervision and community custody conditions. See RCW 9.95.420(2)-(3); see also State v. McClinton, 186 Wn. App. 826, 835, 347 P.3d 889 (2015) ("If there were no way to monitor an offender's compliance with the conditions of community custody, the imposition of such conditions would be meaningless."). These requirements are not predicated upon citizenship. Carreno-Maldonado conceded as much at oral argument. Wash. Court of Appeals oral argument, In re Pers. Restraint of Carreno-Maldonado, No. 87073-4-I (Sept. 13, 2023), at 3 min., 36 sec. through 3 min., 47 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025031227/. There is otherwise no evidence before us that the ISRB denied Carreno-Maldonado early release because he is a noncitizen.[15] Rather, the

---

[15] Carreno-Maldonado cites to Henderson v. Thompson, 200 Wn.2d 417, 518 P.3d 1011 (2022), for the proposition that it is the State's burden to establish that Carreno-Maldonado's citizenship status was not a factor in the ISRB's denial of release. Henderson discussed this burden-shifting rule in the context of a race-based challenge to a jury verdict pursuant to a motion under Washington Superior Court Civil Rule (CR) 59(a)(2) and not an equal protection claim. See 200 Wn.2d at 431-32, 435. Thus, Henderson is inapposite. In the context of equal protection, "[a] party challenging a classification bears the burden of proving that it violates equal protection." Washington Pub. Emps. Ass'n v. State, 127 Wn. App. 254, 263, 110 P.3d 1154 (2005); see Osman, 157 Wn.2d at 485-87.

ISRB's 2022 decision shows it denied Carreno-Maldonado's request for early release because his personal circumstances could preclude his practical compliance necessary to mitigate his high risk of reoffense. See Osman, 157 Wn.2d at 479, 487-88. Because Carreno-Maldonado has not shown that the ISRB treated him differently based on his noncitizen status, his equal protection challenge fails.[16]

B.  DOC Policy No. 320.100

DOC Policy No. 320.100 identifies groups of inmates who may be represented by a defense attorney during an ISRB hearing. Carreno-Maldonado challenges the policy on the basis that it violates equal protection by not allowing convicted sex offenders subject to the ISRB's end of sentence reviews to be represented by an attorney at their release hearings under RCW 9.95.420. Carreno-Maldonado argues that no rational basis exists for DOC to only permit some ISRB-eligible inmates to have attorney representation at their release hearings. We disagree.

As we state above, in evaluating an equal protection claim, a court must first determine whether the claimant is similarly situated with other persons. Osman, 157 Wn.2d at 484. "A [petitioner] must establish that he received disparate treatment because of membership in a class of similarly situated individuals." Id.

DOC Policy 320.100 sets forth three categories of offenders who may be represented by an attorney.

___

[16] Carreno-Maldonado also claims that the ISRB, by denying his early release, violated his statutory right to be free from discrimination under Washington's Law Against Discrimination (WLAD), ch. 49.60 RCW. See RCW 9.60.030. Because Carreno-Maldonado has not established that the ISRB denied his release based on his noncitizen offender status, we need not determine if Carreno-Maldonado, as a sex offender with an immigration detainer, is a member of a protected class as contemplated by WLAD.

The first category are offenders who were sentenced before the SRA[17] and who are subject to an indeterminate sentencing scheme that does not, unlike RCW 9.95.420, include a presumption of early release. See DOC Policy No. 320.105; RCW 9.95.100; RCW 9.95.420(3)(a).

The second category are offenders who committed their crimes as juveniles and are subject to long sentences as adults. See DOC Policy 320.120; RCW 9.94A.730.

Lastly, the DOC policy allows attorney representation for sex offenders determined by the ISRB to suffer from a cognitive or mental health issue that prohibits them from participating in release hearings under RCW 9.95.420.

Carreno-Maldonado claims that because they are all subject to the ISRB's discretion regarding early release, offenders who qualify for attorney representation under the policy are similarly situated with offenders who are not permitted representation at their release hearings. He argues that because the general need for legal representation is not distinguishable among different groups of ISRB-eligible offenders, the policy's disparate treatment regarding access to counsel does not serve a legitimate purpose. Carreno-Maldonado avers that the distinctions allow the ISRB to manipulate the fairness of early release hearings such that "sex offenders will have the least fair hearings."

First, it is well established that the limited liberty interests implicated in a .420 hearing entitle sex offenders to minimum procedural protections that do not include the right to counsel. In re Pers. Restraint of McCarthy, 161 Wn.2d 234, 237, 164 P.3d 1283 (2007). Therefore, Carreno-Maldonado's claim that sex offenders who are not permitted

---

[17] Enacted in 1981, the SRA became effective on July 1, 1984. LAWS OF 1981, ch. 137, § 7.

attorney representation at their .420 hearings comparatively have "the least fair" release hearings is a conclusory statement unsupported by law.

Second, by its explicitly drawn categories, DOC Policy 320.100 demonstrates that offenders eligible for attorney representation at their release hearings are not similarly situated with sex offenders who are able to participate in their release hearings under RCW 9.95.420. Unlike those who may be legally represented at their release hearings, Carreno-Maldonado was sentenced under an indeterminate sentencing scheme with the presumption of early release, was not sentenced as a juvenile, and does not assert that he has a cognitive or mental health issue that prohibits him from participating in a .420 hearing.

The identification of a generally common characteristic—that all offenders at issue are subject to the ISRB's jurisdiction—is not sufficient to establish that sex offenders not permitted attorney representation in a .420 hearing are similarly situated to those offenders permitted attorney representation under the challenged policy. Instead, for the purposes of an equal protection inquiry, individuals must have "materially similar circumstances" to be similarly situated. State v. Sosa, 198 Wn. App. 176, 184, 393 P.3d 796 (2017). "Without materially similar circumstances, there can be no complaint about disparate treatment." Id. DOC Policy 320.100 draws distinctions among ISRB-eligible offenders and defines an offender's ability to be represented by an attorney at their release hearing according to these distinctions. "Where persons of different classes are treated differently, there is no equal protection violation." In re Pers. Restraint of Galvez, 79 Wn. App. 655, 659, 904 P.2d 790 (1995) (citing Forbes v. Seattle, 113 Wn.2d 929, 943, 785 P.2d 431 (1990)).

19

Even assuming arguendo that Carreno-Maldonado and other ISRB-eligible sex offenders who are not covered by DOC Policy 320.100 are similarly situated with offenders permitted attorney representation under the policy, his equal protection claim fails because the distinction in classification is constitutional. The classification involved here does not involve a suspect or semi-suspect class and does not threaten a fundamental right. See State v. Ward, 123 Wn.2d 488, 516, 869 P.2d 1062 (1994) ("Sex offenders are not a suspect class for purposes of equal protection review.") (citing In re Pers. Restraint of Borders, 114 Wn.2d 171, 177, 786 P.2d 789 (1990)); McCarthy, 161 Wn.2d at 237 (holding that sex offenders do not have due process right to counsel in .420 hearings). Therefore, the classification is subject to minimal judicial scrutiny under the rational basis test.[18] Osman, 157 Wn.2d at 484; Shawn P., 122 Wn.2d at 560; see also In re Pers. Restraint of Stanphill, 134 Wn.2d 165, 174-75, 949 P.2d 365 (1998) ("A petitioner who is in legal custody after a judgment and sentence is left with a conditional liberty interest. When a statutory classification affects a conditional liberty interest, the rational relationship test applies to the equal protection challenge." (internal citation omitted)).

Under the rational basis test, the state need only show that allowing attorney representation at release hearings for certain categories of offenders is based on reasons rationally related to a legitimate state purpose. See In re Pers. Restraint of Fogle, 128 Wn.2d 56, 62, 904 P.2d 722 (1995); In re Pers. Restraint of Whitesel, 111 Wn.2d 621, 634, 763 P.2d 199 (1988). The DOC policy is presumed to be constitutional; the burden is on the party challenging a policy to establish that it is purely arbitrary.

---

[18] Carreno-Maldonado concedes that rational basis review applies.

Tunstall v. Bergeson, 141 Wn.2d 201, 226-27, 5 P.3d 691 (2000); In re Pers. Restraint of Salinas, 130 Wn. App. 772, 777, 124 P.3d 665 (2005); see also State v. Haq, 166 Wn. App. 221, 254-56, 268 P.3d 997 (2012) (analyzing equal protection challenge to jail policies under rational basis standard). In other words, under rational basis review, the test is merely whether "'any state of facts reasonably can be conceived that would sustain [the classification].'" Forbes v. City of Seattle, 113 Wn.2d 929, 946, 785 P.2d 431 (1990) (alteration in original) (quoting Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959)).

In applying the rational basis test to DOC Policy 320.100, we are persuaded that the policy's classification of offenders eligible for attorney representation at release hearings to the general exclusion of indeterminately sentenced sex offenders subject to .420 hearings is not arbitrary but rationally related to the state's legitimate purposes.

First, the ISRB has shown that allowing pre-SRA offenders to have attorney representation advances the legitimate goal of avoiding the unnecessary costs related to the incarceration of aging offenders who do not enjoy a rebuttable presumption of release that sex offenders enjoy under RCW 9.95.420. See RCW 9.95.100; State v. Clarke, 156 Wn.2d 880, 890, 134 P.3d 188 (2006) (describing that under Washington's former indeterminate sentencing system, "the presumption was that the offender would remain in custody unless the ISRB determined that he had been rehabilitated"); In re Pers. Restraint of Troupe, 4 Wn. App. 2d 715, 735, 423 P.3d 878 (2018) (stating that conserving financial resources is a legitimate state purpose); see also Pierce v. State, Dep't of Soc. & Health Servs., 97 Wn.2d 552, 557, 646 P.2d 1382 (1982) (observing

that the purpose of parole is to reintegrate offenders into society in tandem with the objective of "alleviat[ing] the cost of keeping those persons in prison").

Second, permitting attorney representation for juvenile offenders at release hearings advances the state's compelling interest in rehabilitating and reintegrating juvenile offenders into the community. See State v. K.H.-H., 188 Wn. App. 413, 421, 353 P.3d 661 (2015), aff'd, 185 Wn.2d 745, 374 P.3d 1141 (2016); see also State v. Garza, 200 Wn.2d 449, 453, 518 P.3d 1029 (2022) (stating that Washington's juvenile criminal justice system seeks to fulfill, through the Juvenile Justice Act of 1977 (JJA), ch. 13.40 RCW, "the dual purpose of holding juveniles accountable and fostering rehabilitation for reintegration into society"). It follows that juvenile offenders are different from adults, State v. Anderson, 200 Wn.2d 266, 285, 516 P.3d 1213 (2022), and the public policy of rehabilitation and reintegration provides a rational basis as to why they should be treated differently.[19] K.H.-H., 185 Wn.2d at 755 ("[J]uveniles are, by their very nature, still developing. The JJA recognizes the differences between adults and juveniles and embraces rehabilitation as a primary goal.")

Alternatively, as the ISRB asserts, the primary focus in respect to post-SRA indeterminately sentenced adult sex offenders like Carreno-Maldonado is to promote community safety. "The state has a compelling interest in promoting the health, safety, and welfare of its citizens." State v. Smith, 185 Wn. App. 945, 955, 344 P.3d 1244 (2015). The ISRB cites RCW 72.09.340(1), which states that, "In making all

---

[19] As the ISRB alludes to in its argument, Miller-fix resentencing hearings for juvenile offenders were created to address unconstitutional juvenile life sentences. State v. Delbosque, 195 Wn.2d 106, 112, 456 P.3d 806 (2020); In re Pers. Restraint of Hinton, 1 Wn.3d 317, 331-32, 525 P.3d 156 (2023) see Miller v. Alabama, 567 U.S. 460, 470, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012) ("[M]andatory life-without-parole sentences for juveniles violate the Eighth Amendment.") (citing U.S. CONST. amend. VIII).

discretionary decisions regarding release plans for and supervision of sex offenders, the department shall set priorities and make decisions based on an assessment of public safety risks." To this end, the ISRB only permits attorney representation under DOC Policy 320.100 where an offender's condition prevents them being able to individually participate in their .420 hearings.

The rational basis test requires a challenger to "negat[e] every conceivable basis" that might support the government's conduct. King County Dep't of Adult & Juv. Det. v. Parmelee, 162 Wn App. 337, 359, 254 P.3d 927 (2011). The State's policy need not be the best means to achieve its goals but only be rationally related to legitimate goals. Vet Voice Found. v. Hobbs, 4 Wn.3d 383, 400, 564 P.3d 978 (2025). Accordingly, Carreno-Maldonado "must do more than merely question the wisdom and expediency" of the classification. Forbes, 113 Wn.2d at 946. He must instead conclusively establish that the classification is contrary to the State's articulated purpose. See id. Carreno-Maldonado has not met this burden.[20]

Cruel Punishment

"Although the legislature has authority to set punishment for crimes, 'legislative authority is ultimately circumscribed by the constitutional mandate forbidding cruel punishment.'" State v. Carter, 3 Wn.3d 198, 213, 548 P.3d 935 (2024) (quoting State v. Fain, 94 Wn.2d 387, 402, 617 P.2d 720 (1980)). Under article 1, section 14 of our state constitution, "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."

---

[20] Because Carreno-Maldonado did not meet his burden to establish that DOC Policy No. 320.100 violates equal protection, we do not address his argument that he was entitled to counsel based on his indigent status.

Carreno-Maldonado contends that the ISRB's finding that he is not releasable because his immigration detainer prevents him from completing the community portion of sex offender treatment[21] effectively assigns him to a de facto death sentence in prison in violation of cruel punishment protections. He asserts that his status as a noncitizen subject to deportation is an "immutable factor" outside of his control and argues it is cruel punishment for this immutable factor to preclude his early release from his life sentence. We disagree on several bases.

First, we observe that an immigration detainer status is categorically not an immutable factor or characteristic. One's detainer status is not "'determined solely by the accident of birth'" like their race, ethnicity, or nationality. Kustura v. Dep't of Lab. & Indus., 142 Wn. App. 655, 685, 175 P.3d 1117 (2008), aff'd on other grounds by, 169 Wn.2d 81, 233 P.3d 853 (2010) (quoting Frontiero v. Richardson, 411 U.S. 677, 686, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973)). Carreno-Maldonado's immigration detainer does not stem from the mere fact of his existence but has been imposed because of the crimes he committed. See 8 U.S.C. §1227(a)(2)(A)(ii). We recently defined an immutable characteristic as one that is "'not capable or susceptible of change.'" Piper v. State, 16 Wn. App. 2d 177, 205, 480 P.3d 438 (2021) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1131 (2002)). Although Carreno-Maldonado's detainer status may not change, it is nonetheless susceptible to change based on federal government action or changes in federal law.

---

[21] The ISRB expressly based its 2022 decision in part on the undisputed fact that because he has an immigration detainer, he is not able to complete the community portion of SOTAP. The ISRB observed in both of its 2022 and 2024 decisions that Carreno-Maldonado completed the institution portion of SOTAP.

Second, Carreno-Maldonado does not provide argument to establish that our state's protection against cruel punishment applies in the specific context of an administrative body's responsibility to ensure individualized community custody options to assist an offender in achieving early release from their life sentence. In certain contexts, our state constitution's cruel punishment provision has been held more protective than the Eighth Amendment, including in the context of disproportionate sentencing. See, e.g., Fain, 94 Wn.2d at 391-92, 402 (disproportionate sentencing); In re Pers. Restraint of Williams, 198 Wn.2d 342, 362, 496 P.3d 289 (2021) (prison conditions affecting prisoner's health and safety). However, "[e]ven where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications."[22] State v. Ramos, 187 Wn.2d 420, 454, 387 P.3d 650 (2017).

Carreno-Maldonado asserts that an independent state cruel punishment analysis is favored in the context of challenges to life sentences for certain offenses or offender populations. But Carreno-Maldonado does not challenge his underlying maximum sentence of life imprisonment under former RCW 9.94A.712 (2004). And he offers no authority to establish that a sex offender sentenced to an indeterminate life sentence is cruelly punished where the ISRB extends the offender's minimum sentence based on a finding that the offender is more likely than not to reoffend if released. See RCW

---

[22] The analysis to determine whether, in any given context, the Washington State Constitution is more protective than the federal constitution requires a consideration of "nonexclusive neutral criteria," including "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." State v. Gunwall, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

9.95.420(3). Carreno-Maldonado thus does not establish that our state's broader protection against cruel punishment applies in this context. See In re Pers. Restraint of Rhem, 188 Wn.2d 321, 328, 394 P.3d 367 (2017) ("[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.").[23]

Third, we observe that the legislature has determined that Carreno-Maldonado's convictions warrant a sentence of life in prison with the possibility of early release. See former RCW 9.94A.712 (2004). Carreno-Maldonado concedes that he has no constitutional right to be released before his life sentence expires. He nonetheless argues that the ISRB's approach renders his sentence unconstitutionally cruel by removing the possibility of release.

Carreno-Maldonado is correct that he has no constitutional right to release prior to the expiration of a valid sentence. See Clarke, 156 Wn.2d at 890 ("[A]n inmate has no constitutional right to release prior to the expiration of a valid sentence because his conviction extinguishes his liberty interests."). Although RCW 9.95.420(3) creates a presumption in favor of release that grants eligible offenders a limited liberty interest, this is related to the eligible offender's constitutional right to have an opportunity to be

---

[23] Despite not establishing that Washington's broader cruel punishment protections apply in the context of his claim, Carreno-Maldonado asserts that his purported detainer-based barrier to release constitutes cruel punishment under Bassett's categorical bar test. See State v. Bassett, 192 Wn.2d 67, 83-85, 428 P.3d 343 (2018). The Bassett test requires a court to "'address (1) whether there are 'objective indicia of a national consensus against the sentencing practice' and (2) whether our independent judgment, based on controlling precedent and our understanding and interpretation of the cruel punishment provision's text, history, and purpose, weighs against the sentencing practice.'" State v. Reynolds, 2 Wn.3d 195, 203-04, 535 P.3d 427 (2023) (citing Bassett, 192 Wn.2d at 83)). Because Carreno-Maldonado does not present authority or argument to support the extension of the Bassett test beyond sentencing practices to the implementation of a particular sentence, we do not address his unsupported contention further. See Peterson v. Dep't of Labor & Indus., 17 Wn. App. 2d 208, 237, 485 P.3d 338 (2021) ("Where a party does not cite to such authority, we assume there is none.").

heard and for the ISRB to meaningfully consider the offender's case for early release. McCarthy, 161 Wn.2d at 241-44.[24]

If the ISRB does not order the offender released, the ISRB must establish a new minimum term under RCW 9.95.011. RCW 9.95.420(3)(a). However, the offender is not guaranteed release upon serving the minimum term. The minimum term only establishes the date when the offender again becomes eligible to be considered for early release. RCW 9.95.420(3)(a); see McCarthy, 161 Wn.2d at 243-44; Cashaw, 123 Wn.2d at 147. An offender eligible for ISRB's proceedings is subject entirely to its discretion; the ISRB may release the offender "now or never." In re Pers. Restraint of Powell, 117 Wn.2d 175, 196, 814 P.2d 635 (1991); see McCarthy, 161 Wn.2d at 243-44 (stating that .420 hearings are analogous to parole release because "[o]ffenders in .420 hearings face continued incarceration" and the ISRB's inquiry during .420 hearings is discretionary). Early release is thus a privilege granted by an administrative body rather than a protected entitlement. See Fain, 94 Wn.2d at 394.

Therefore, although Carreno-Maldonado must have a meaningful opportunity to be heard by the ISRB, his own chances for discretionary release under RCW 9.95.420(3) are not legally enforceable. See Fain, 94 Wn.2d at 395; McCarthy, 161 Wn.2d at 241-44. It is thus not the offender's diminished hope of release from their maximum sentence that can constitute cruel punishment, but whether the offender's underlying sentence is unconstitutional when measured against their crimes. See Fain,

---

[24] The Washington Supreme Court's holding that the presumption of release under RCW 9.95.420 creates a limited liberty interest in release hearings was in the context of the court's determination that offenders in a .420 hearing are afforded minimum protections under due process. McCarthy, 161 Wn.2d at 245. The court recognized that "[i]nmates generally do not have a liberty interest in release prior to the expiration of a valid sentence." Id. at 240 (citing Clarke, 156 Wn.2d at 890).

94 Wn.2d at 395. By enacting former RCW 9.94A.712 (2004), the legislature directed that a life sentence is a valid sentence for rape in the first and second degree and that such sentences should be imposed. Clarke, 156 Wn.2d at 890; see RCW 9A.44.050(1)(a), (2). For the foregoing reasons, we conclude that Carreno-Maldonado's cruel punishment allegation is without merit.

<u>Abuse of Discretion</u>

Lastly, Carreno-Maldonado challenges the ISRB's determination that he is not releasable following his second .420 hearing on the basis that the ISRB failed to meaningfully consider potential conditions of release.[25] Carreno-Maldonado argues that the ISRB's listing of limited and generic community conditions is not adequate to demonstrate that the ISRB meaningfully considered release conditions. We agree and reverse and remand for a new .420 hearing on this basis.

This court reviews ISRB decisions denying release and setting a new minimum term for an abuse of discretion. In re Pers. Restraint of Dyer, 175 Wn.2d 186, 196, 283 P.3d 1103 (2012) (Dyer III). Although the ISRB is not required to follow a mathematical formula in its release determination, its discretion is not unchecked. In re Pers. Restraint of Dodge, 198 Wn.2d 826, 844, 502 P.3d 349 (2022). The ISRB must exercise its discretion in compliance with applicable statutes and rules. Id. at 837. The ISRB abuses its discretion if it "bases its decision on 'an erroneous view of the law,' or when it 'acts without consideration of and in disregard of the facts.'" Id. (quoting In re Pers. Restraint of Dyer, 157 Wn.2d 358, 369, 139 P.3d 320 (2006) (Dyer I)). The ISRB also abuses its

_____

[25] Carreno-Maldonado initially challenged the ISRB's findings regarding his behavior and infraction history in its decision following his first .420 hearing but later withdrew his challenge based on the ISRB's 2024 decision.

discretion where it "supports its decision with speculation and conjecture." Dyer I, 157 Wn.2d at 369.

Our Supreme Court's analysis in Dodge regarding early release of juvenile offenders under RCW 9.94A.730 instructs the interpretation of the ISRB's responsibility in considering an offender's release under RCW 9.95.420. Dodge, 198 Wn.2d at 830-31, 842-45. The Dodge court observed that "'an early release hearing looks to the future and focuses on one's likelihood of reoffending.'" Id. at 844 (quoting In re Pers. Restraint of Brooks, 197 Wn.2d 94, 102, 480 P.3d 399 (2021)). As such, the ISRB must "presum[e] release and meaningfully consider[] conditions to help accomplish release" in tandem with considering public safety. Id. at 842. Like RCW 9.94A.730, the ISRB is required under RCW 9.95.420 to release the offender under "appropriate" 'affirmative and other conditions" unless it finds by a preponderance of the evidence that "despite such conditions" the offender is more likely than not to reoffend. RCW 9.94A.730(3); RCW 9.95.420(3). Thus, an ISRB's discretion in making release decisions is not without limitations. Dodge, 198 Wn.2d at 844; McCarthy, 161 Wn.2d at 240, 241).

In observing this presumption of release, the ISRB must develop a record to show that it meaningfully considered potential conditions of release and whether such conditions would sufficiently mitigate the offender's level of risk of reoffense. Dodge, 198 Wn.2d at 834-44. The ISRB's "consideration of public safety is part of the ISRB's consideration of the petitioner's likelihood to reoffend—not a separate, countervailing requirement. Otherwise, the presumption of release would have no meaning—because the only way to absolutely guarantee public safety would be to never release anyone." Id. at 841-42.

In considering potential release conditions, a mere listing of conditions and a conclusion that such conditions cannot adequately mitigate an offender's risk level does not suffice. Id. at 843-44. An adequate record does not require that the ISRB "specifically list any and all potential conditions it might set." Id. at 843. Rather, the ISRB must develop a record to show that the ISRB "meaningfully considered the presumption of release or whether any conditions of release would sufficiently mitigate [the offender's] risk level." Id. at 843-44.

In the present case, the ISRB was aware of Carreno-Maldonado's immigration detainer and that he would not be subject to any DOC supervision if deported, contrary to his statutory lifetime community supervision requirement. See former RCW 9.94A.712(3), (5). The record shows that, in consideration of potential release conditions, the ISRB determined that the detainer on Carreno-Maldonado precluded in practicality his ability to comply with any mandated community supervision conditions.

However, the ISRB's denial of Carreno-Maldonado's release in 2024 was based on another reason. Its 2024 decision mentions its 2022 decision but makes no mention of any concern of the impact of Carreno-Maldonado's immigration detainer on his ability to comply with DOC supervision. We are left with reviewing whether the ISRB meaningfully considered community custody conditions in its determination as to whether Carreno-Maldonado is more likely than not to reoffend if released.

The ISRB stated that its 2024 decision was based on Carreno-Maldonado's high risk of reoffense as evidenced by his Level III sex offender classification as determined by the ESRC, ESRC risk assessments, and the ESRC's selection of Carreno-Maldonado for an FPE. Aside from a conclusory statement that it "considered"

community custody conditions, the record provides little more. This is deficient under Dodge, 198 Wn.2d at 840, 843-44.

The ISRB's written decision is a mere seven pages. While the ISRB stated it "considered all potential conditions of community custody it may lawfully impose" and that those conditions and "any favorable evidence" "would not sufficiently reduce the likelihood of []Carreno-Maldonado committing new sex offenses," there is nothing in the record regarding discussion of the effectiveness of any of the community custody conditions. Instead, the ISRB provided two bases to support its conclusion:

- Mr. Carreno-Maldonado has been assessed by the ESRC SVP Subcommittee as needing a Forensic Psychological Evaluation (FPE) which must occur before he can be considered for release. The FPE will provide the Board with important information to be considered as part of a release decision. Only a small percentage of the highest risk sex offenders are reviewed for, and selected by the ESRC SVP Subcommittee for an FPE, indicative of the risk Mr. Carreno-Maldonado presents at this time.
- Mr. Carreno-Maldonado is a high-risk sex offender as evidence by being assessed as a Level 3 sexual offender by the ESRC. He scores +7 on the Static 99-R and +15 on the Stable 2007 indicating a high risk.

We observe that the record does not explain why the ISRB did not previously request the completion of the FPE prior to his .420 hearing. This is even more perplexing based on the ISRB's observation that an FPE will provide "important information to be considered as part of a release decision." More importantly, nowhere does the ISRB discuss the effectiveness of any of the potential conditions of community custody and the two bases it relies on do not answer the question as to whether such conditions would sufficiently mitigate the offender's level of risk of reoffense. Dodge, 198 Wn.2d at 834-44. Accordingly, the ISRB in 2024 abused its discretion by failing to

meaningfully consider Carreno-Maldonado's presumption of release and potential release conditions.

## CONCLUSION

The ISRB abused its discretion in 2024 by failing to meaningfully consider whether any conditions of release would sufficiently mitigate Carreno-Maldonado's risk level as required by RCW 9.95.420 and Dodge. The remedy for this abuse of discretion is "remand for a new hearing." Dodge, 198 Wn.2d at 845. Accordingly, we reverse and remand for the ISRB to conduct a new .420 hearing as soon as reasonably practicable, presumably with a completed FPE.[26]

_____
Coburn, J.

WE CONCUR:

_____
Feldman, J.

_____
Birk, J.

---

[26] As mentioned above, the ISRB's 2024 decision states that the ISRB "will notify the ESRC that the previously recommended [FPE] should be completed prior to the next hearing."